**STATES v. PHILLIPS PETROLEUM CO.**

No. 11135.

Court of Civil Appeals of Texas. San Antonio.

April 1, 1942.

Rehearing Denied April 29, 1942.

P. G. Greenwood, of Harlingen, and Oxford, Haigh & Oxford, of Edinburg, for appellant.

E. H. Foster and Warren M. Sparks, both of Amarillo, Hill & Franki, of Mission, and Don Emery and R. L. Foster, both of Bartlesville, Okl., for appellee.

NORVELL, Justice.

D. O. States, appellant, brought this action against Phillips Petroleum Company, appellee, claiming that Phillips had breached an implied covenant to drill an offset well upon States' land. The trial court peremptorily instructed the jury to find for appellee and judgment was rendered that appellant take nothing.

[1] The parties seem in agreement as to the applicable rule involved, which is stated by Walker as follows: "The lessee is not obligated to protect against all drainage. The requisite standard of conduct is simply that of the ordinarily prudent person under similar circumstances. Even though drainage exists no implied duty to offset will arise unless it also appears that the offset well would be sufficiently productive to pay the lessee a profit over and above drilling and operating expenses. The burden of establishing this fact rests upon the lessor as an essential element of his cause of action." Walker, Nature of Property Interests created by an Oil and Gas Lease in Texas, 11 Tex.Law Review 433–434. See, also, Texas Pacific Coal & Oil Co. v. Barker, 117 Tex. 418, 6 S.W.2d 1031, 60 A.L.R. 936; Magnolia Petroleum Company v. Page, Tex.Civ.App., 141 S.W.2d 691, writ refused.

We hold that in determining whether or not a proposed offset well will be sufficiently productive to pay the lessee a profit over and above drilling and operating expenses, only such prospective production may be considered as an ordinarily prudent operator might reasonably expect to obtain without the commission of waste, as that term is defined by § 3, Article 6008, Vernon's Ann.Civ.Stats.

This holding is decisive of the appeal as its application to the undisputed facts disclosed by the record demonstrates the correctness of the trial court's judgment.

The States tract of land consists of 33.42 acres situated in the La Blanca Gas Field, Hidalgo County, Texas. The oil and gas lease involved was executed on February 23, 1934. It provided for a primary term of five and one-half years and contained no express covenants concerning the drilling of offset wells. Phillips acquired the lease by assignment in December, 1936. The lease

was terminated on August 23, 1938, by non-payment of delay rentals and was shortly thereafter released of record.

A total of eleven wells have been drilled in the La Blanca field, seven of which are now producing. The discovery well was Pantano-Engelman No. 1, completed in a 6,600 foot sand, on January 14, 1937, and later deepened to a 7,800 foot sand in the spring of the following year. Pantano-McDougal No. 1 was completed in the 7,800 sand on February 6, 1937. The Engelman well is situated about 335 feet north and the McDougal well about 1,000 feet south of the boundary lines of appellant's tract of land. The Sterling-Engelman, located to the north of Pantano-Engelman, was completed in April, 1937. Three producing wells were completed between August and October, 1937, while the seventh and last producer was completed in September, 1939.

Three wells were lost before production had been obtained. One of these, the Pantano-Sheed, was lost as the result of a blow-out.

Davenport-Swallow No. 2 was completed as a producer but blew out in January, 1938, caught fire and ran wild for thirteen months before it was finally brought under control.

The La Blanca field is in a high pressure gas area. The Engelman and McDougal wells, as well as all others mentioned, produce gas and distillate at a ratio in excess of 100,000 cubic feet of gas to one barrel of distillate. The production obtained in a well upon the States tract would in all probability be similar to that obtained from the other wells in the field.

On December 19, 1937, the Railroad Commission classified all wells then in the field as gas wells and ordered them produced as such. As a result of this order, distillate production was reduced to not more than two per cent of capacity of the wells. On January 11, 1938, because of the blowing out of Davenport-Swallow No. 2, the Railroad Commission promulgated a temporary order allowing the operators in the La Blanca field to produce at the rate of twenty-five per cent of their open flow potential until such time as the blow-out was brought under control. This order remained in effect until about March of 1939.

The gas produced in the La Blanca field is "sweet gas," and it appears that prior to the time the Davenport-Swallow No. 2 was brought under control, there was no known method of recycling which would have been feasible for use in the development of the States lease. In fact, the only practical utilization of the gas produced in the field permitted by § 7, Article 6008, was for light or fuel purposes. The available market for gas for such purposes did not exceed two to three million cubic feet per day (less than two per cent of the potential of the producers in the field), which would permit the production of some twenty to thirty barrels of distillate at a 100,000 to 1 ratio. It appears that almost the entire gas market was supplied by the McDougal well. However, if the distribution of the available market be viewed in the light most favorable to appellant, and it be considered that a hypothetical States well would have shared the market proportionately with the Engelman, McDougal and Sterling—Engelman (completed in April, 1937), the unprofitability of such well is susceptible of mathematical demonstration. According to the record, the cost of the well would have been not less than $65,000, and the prevailing price for gas was about 2½ cents per M. The market sales price for distillate was around $1.25 per barrel.

It can not be said that appellee was under a duty to drill an offset on the States land prior to the classification of the field as a gas field by the Railroad Commission. Certainly, in view of the proportions of oil and gas discovered in the Engelman and McDougal wells, a prudent operator would have anticipated the Railroad Commission's classification. Surely no person could be charged with an implied duty to drill a well upon the chance that he might recover the cost thereof before the Railroad Commission undertook the enforcement of the conservation laws of the State.

For like reason, it can not be held that a prudent operator should have drilled the States offset upon the chance that he could recover his costs while the Davenport-Swallow No. 2 was running wild and the Railroad Commission was permitting a production of twenty-five per cent of the potential.

We mention briefly one other matter disclosed by the record, which is discussed in the briefs, but not deemed material to a decision of the case, for the reasons hereinafter stated.

As a result of the Davenport-Swallow No. 2 blow-out, the gas pressure of the 7,800 foot sand was greatly reduced. Some time after March, 1939, Dr. Burton McCollum, the discoverer of the field, perfected a re-

cycling process, which had not theretofore been used by the oil industry and which is not now used outside the La Blanca field, whereby gas is taken from a highly charged gas stratum lying above the 7,800 foot level, brought to the surface and processed for distillate and then inserted into the now comparatively low pressure 7,800 foot sands. This process is dependent upon the considerable difference in gas pressure in two separate sands, a condition that did not exist prior to the blow-out.

However, as above pointed out, the States-Phillips lease terminated in August 1938. The McCollum recycling process was not put into operation until long after that date. A prudent operator in determining whether or not he could with profit drill an offset well, would not be charged with anticipating or foreseeing that a blow-out of the magnitude of that experienced in the Davenport-Swallow No. 2 would have occurred and, having occurred, that the well would run wild so long that the gas pressure in the 7,800 foot sand would be substantially depleted, and that as a result thereof an entirely novel method of recycling would be invented or perfected, which could be put to an economical and practical use in the development of the field.

For the reasons above stated, we hold that the trial court correctly instructed the jury to find for the appellee, and the judgment based thereon is accordingly affirmed.