POINDEXTER v. LION OIL REFINING COMPANY.

4-6927                                       167 S. W. 2d 492

Opinion delivered January 18, 1943.

---
[1] Paxton v. State, 108 Ark. 316, 157 S. W. 396.

*Ezra Garner,* for appellant.

*Davis & Allen,* for appellee.

CARTER, J. Plaintiffs below sought to cancel two oil and gas leases on lands owned by them. Producing oil wells had been completed on lands immediately adjoining plaintiff's lands and were producing in large volume. The defendant, Lion Oil Company, holds the leases on plaintiffs' lands, and has refused to drill on them and has announced that it has no intention of ever drilling unless further exploration in the field by some operator other than itself discovers producing formations other than those from which production is now being had on the adjoining lands. Its experts are of the opinion that wells drilled on the lands of plaintiffs, covered by the leases sought to be canceled, would not produce from the only known producing formations enough oil to return to it the cost of producing it plus a reasonable profit. The defendant contends that it is not bound under such circumstances to drill these lands, and that it may hold them unproductive by merely paying the delay rentals until some unknown and purely speculative explorations by some other operator on other lands in the field may discover oil in paying quantities from a different source than any now known, which discovery may cause the defendant to drill these lands.

The Chancellor refused to cancel the lease and the landowners have appealed.

The leases are in the form known as "Form 88 1/8th gas," being the form generally in use in this state for

many years, and now in use except for clauses recently added covering unitization and war conditions. Both leases are dated January 4, 1936. Both recite a consideration of "Ten and other dollars in cash in hand paid . . . and of the covenants and agreements hereinafter contained on the part of the lessee to be paid, kept and performed." No other cash consideration is shown in the record and we must treat the leases as ones "where the principal consideration is the payment of royalties" anticipated from future production.

The lands are let to the lessee "for the sole and only purpose of mining and operating for oil and gas" and the ordinary purposes connected therewith. The leases were for a term of ten years from date and as long thereafter as oil or gas is produced from the land. The lessee covenanted to pay and deliver royalties to the lessors in the amount of one-eighth of the oil and one-eighth of the gross proceeds of the gas. The leases were to terminate on January 4, 1937, if no well had been commenced on the land before then, "unless the lessee on or before that date shall pay or tender to the lessor, or to the lessor's credit in the Farmer's Bank & Trust Company, at Magnolia, Arkansas, or its successors, which shall continue as the depository regardless of changes in the ownership of said land, the sum of" . . . (50 cents per acre) . . . "which shall operate as a rental and cover the privilege of deferring the commencement of a well for twelve months from said date. In like manner and upon like payments or tenders the commencement of a well may be further deferred for like periods of the same number of months successively."

The delay rentals were paid for all twelve month periods up to and including that beginning January 4, 1940. During 1940, producing wells were brought in on lands immediately adjoining the leased lands and lessors made demand that offsets be drilled, refused to accept any further delay rentals, although same were duly tendered, and brought this suit in January, 1941.

The lands covered by these two leases are in sections 25 and 26 in township 17 south, range 20 west in

Columbia county, Arkansas. Among these lands are the following described tracts, after each one of which is stated the facts as to production on the adjoining lands. Under the regulations of the state commission, drilling is restricted to one well per forty acre tract according to the government survey, such well to be in the center thereof except where special permission is granted to drill elsewhere or on a smaller unit. All of the wells, except in one case which is noted, have made their full allowable production since completion. The price of oil during 1940 and 1941 ranged between 88 cents and $1.06 per barrel.

■ *The West 32 acres of the NW¼ NW¼ of Section 25.* There is a well in the center of the SW¼ SW¼ of section 24,—660 feet from the north line of this 32 acres. This was completed on April 8, 1940, produced 51,702 barrels in 1940 and 63,870 barrels in 1941, a total of 115,572 barrels. It produced no water. There are 87 feet of pay section in this well. In the center of the SE¼ SW¼ of section 24, which forty corners with the NW¼ NW¼ of section 25, there is a well which was completed on April 3, 1940. It produced 50,811 barrels in 1940 and 43,703 barrels in 1941, a total of 94,514 barrels. It did not produce its allowable, but this seems to have been due to some trouble which forced the operator to work the well over. It was producing its full allowable at the end of 1941. It produced no water. There is also a well, described below, in the SE¼ SE¼ of section 23.

■ *The NE¼, NE¼, of Section 26.* There is a well in the center of the SE¼ SE¼ of section 23,—660 feet from the north line of the NE¼ NE¼ of section 26, which was completed February 12, 1940. During 1940, it produced 63,628 barrels, and during 1941 it produced 63,868 barrels, a total of 127,496 barrels. It produced no water. The pay section is 77 feet. Wells in the SW¼ SW¼ of section 24 and the SW¼ SE¼ of section 23 are described elsewhere.

■ *The East Half of the NW¼ of NE¼ of Section 26.* There is a well in the center of the north ¾th of

the SW¼.SE¼ of section 23, a distance of 825 feet from the north line of NW¼ NE¼ of section 26. This was completed Nov. 11, 1939. It has a smaller allowable than the other wells. In 1939, it produced 6,606 barrels, in 1940 some 40,949 barrels and in 1941 some 47,901 barrels, a total of 95,452 barrels. It produced no water.

■ *The North 19 acres of the NE¼ NW¼ of Section 26.* There is a well in the center of the S½ of S½ SW¼ of section 23, a distance of 330 feet from these lands. This was completed July 1, 1940. It produced 34,743 barrels in 1940 and 63,595 barrels in 1941, a total of 98,338 barrels and being only 7 barrels less than its allowable. In 1941, it began to produce water and during December, 1941, although it produced its full allowable in oil its water production amounted to 236% of its oil production. There is also a well in the center of the N½ S½ SW¼ of section 23, which was completed on February 17, 1940, and has since produced 126,315 barrels of oil, being its allowable, and has produced no water.

The testimony of the defendant tended to show that this field was one where water pressure below and behind the oil drove it to the surface, that the formations in which the oil lies slope upward from the south to the north, and that these formations under plaintiff's lands, in the opinion of appellee's experts, lie too far down the slope for oil to be profitably produced therefrom. The oil is supposed to be retreating up the structure to the north, followed by the water. The experts of defendant were of the opinion that a prudent operator could not drill on plaintiff's lands with reasonable expectation of recovering his cost plus a reasonable profit. One witness for defendant, however, (Doering) thought that a good operator might drill on the NW¼ NW¼ of section 25. The experts also testified that the greater portion of the oil under the leased premises would eventually migrate to the north.

The Chancellor made findings as follows:

"That in the year 1940 there were wells drilled in sections 23 and 24, offsetting the lands in question to the north, and it is shown by a preponderance of evi-

dence that said offset wells to the north have a tendency to drain oil from under the lands involved in this suit, and that demand has been made by plaintiffs upon defendant, subsequent to the time said offset wells were drilled, to drill upon the lands in question, or a part thereof, but that no well has been drilled by defendant, or anyone for it, upon the lands involved in this section.

"The Court further finds from a preponderance of evidence in the case that the offset wells on the north are edge wells of the Magnolia field.

"It is further found by the Court, from a preponderance of evidence, that a well drilled in section 26, or in section 25, or any part of either section, so far as this suit is concerned, would not produce oil in sufficient quantities to pay for the drilling of the well. It is the finding of the Court, from the evidence in this case, that wells drilled in this area are to be the approximate depth of 7,280 feet to 7,300 feet; that the cost of drilling offset wells, together with the equipment thereof, would be of the maximum sum of $60,000, with the additional cost of pumping equipment in case it was necessary to put said wells on the pump.

"The Court further finds from the evidence in this case that in the event a well was drilled upon any part of said lands in question defendant could not reasonably expect such well to produce sufficient oil to pay the cost of drilling. It is the opinion of the Court that the probability of sands below the Reynolds lime, from which said offsets are producing, is not an item that can be taken into consideration, because there is no evidence of drainage from plaintiff's land in any other lime.

"It is the opinion of the Court, from the evidence in the case, that defendant has no intention of drilling a well upon any part of the lands in controversy, unless oil in paying quantities is discovered from a different source than is known at the present time."

The Chancellor's finding that if a well was drilled on the leased premises the defendant could not reasonably expect such well to produce sufficient oil to pay the cost of the drilling must be understood in the light

of the testimony upon which it is based. The exact condition and location of the producing formations under the leased premises can never be exactly known until they are drilled. For example, the porosity of the lime varies in this field from well to well and at various depths within the same well. It was the opinion of the geological experts that the conditions were such that an operator could not reasonably expect to recover the cost of drilling.

The Chancellor's finding that the defendant has no intention of drilling a well on these lands is undisputed. The officers of the defendant very frankly testified that they had no intention of drilling for production from the present known formations, that the defendant only had one other eighty acre lease in the entire field and that it had no intention of exploring to discover any other producing formation and that it wanted to hold the lease in the hope that some other operator would make such a discovery and that such a discovery might show that these lands should be drilled.

The Chancellor held under these facts that the landowners were not entitled to cancel the lease. The question before this court is whether this conclusion of law on the part of the Chancellor is correct.

This exact question has not previously been passed on by this court, but previous opinions of this court do assist in answering it.

In the case of *Ezzell* v. *Oil Associates, Inc.,* 180 Ark. 802, 22 S. W. 2d 1015, Chief Justice Hart, after reviewing a number of previous decisions of this court stated (page 810): "So it may be taken, as the well-settled rule in this state, that there is an implied covenant on the part of the lessee in oil and gas leases to proceed with reasonable diligence in the search for oil and gas, and also to continue the search with reasonable diligence, to the end that oil and gas may be produced in paying quantities throughout the whole of the leased premises."

The lease under consideration in the above case covered 1,170 acres. One producing well was completed, nothing else was done and the lessor brought suit to

cancel the lease. The Chancellor did cancel the lease as to approximately one-half of the acreage, but dismissed the complaint as to the remaining one-half and the lessor appealed. This court reversed the Chancellor and remanded the case with directions to cancel the entire lease, except as to the ten acre tract surrounding the one producing well. This court pointed out that when oil or gas was discovered in paying quantities on leased premises the lessee should drill such number of wells as in sound judgment he may deem necessary to secure oil or gas for the mutual advantage of both parties. The court said: "Of course, due deference should be given to the judgment of the lessee as operator to determine how many wells should be drilled, but he must use sound judgment in the matter, and cannot act arbitrarily. He must deal with the leased premises so as to promote the interest of both parties, and to protect their mutual interests. He must act for the mutual advantage, and proceed for both of them, *and must not consider his own interest wholly, or for the most part.* . . . It is true that the drilling of oil wells is very costly, but the parties understood this when they executed the lease. The lessee only agreed to pay the lessors one-eighth of the oil produced as rent, and reserved seven-eighths of it for its own profit in drilling the well, and in undertaking the risk of not finding any oil."

In the case of *Standard Oil Company of Louisiana* v. *Giller,* 183 Ark. 776, 38 S. W. 2d 766, the lease involved covered only forty acres. One well was drilled in the northwest corner and had produced more than 100,000 barrels of oil at a value in excess of $94,000. The lessee refused to drill other wells. The Chancellor canceled the lease except as to the ten acres in the northwest corner and this court affirmed his action. In so doing, it re-affirmed and cited as controlling the remarks of Chief Justice Hart in the Ezzell case to the effect that the lessee must not consider his own interests wholly or for the most part.

In the case of *Smith* v. *Moody,* 192 Ark. 704, 94 S. W. 2d 357, the lease covered 360 acres of land. Four wells were drilled on one forty. The lessee refused to develop

further. The Chancellor canceled the lease except as to the forty acres on which the wells had been drilled and this court affirmed this decision. The court said (page 706 of 192 Ark., 94 S. W. 2d 358): "It is very earnestly insisted that there is a valid excuse for the failure to further develop, . . .

"Much testimony was offered as to the necessity' of drilling other wells, the contention being that the wells now producing were at the edge of the producing fields, and that new wells could not be drilled and operated except at a great loss. This contention may be disposed of by saying that, if true, the lessees have not been damaged by the cancellation of so much of the contract of lease as cannot be profitably performed."

In the case of *Alphin* v. *Gulf Refining Company*, 39 Fed. Sup. 570 (U. S. D. C., W. D. of Arkansas), the plaintiff sought the cancellation of an oil and gas lease in so far as it effected 200 acres out of 440 acres covered by the lease. 240 acres of the original area had been developed by the completion of producing wells, but the lessee refused to drill upon the remaining 200 acres. There had been gas wells upon this 200 acres, but production had ceased some eight or nine years prior to the bringing of the suit and nothing further had been done. It was stipulated that the experts for the defendant would have testified that wells could not have been profitably drilled on this 200 acres. It also appears that other operators in the same field were at that time trying to promote the drilling of a deeper well to explore for oil in formations lower than that from which oil was being produced in the field.

Judge Miller held that the lease would be canceled in so far as it effected the 200 acre tract. He said, (page 567): "Giving due deference to the judgment of the defendant company as an operator and considering all of the facts disclosed by the testimony, I do not think the defendant, Gulf Refining Company, has acted to protect the mutual interests of itself and the plaintiffs. The defendant cannot consider its own interest without regard for the interest of the plaintiffs. . . . The de

fendant cannot be excused from complying with the requirements to develop on the plea of expense or cost.''

In the cases cited, oil had been discovered upon the leased premises and thereafter the lessee had refused to develop further the leased premises. No oil has been discovered on the Poindexter leases now before us, but oil had been discovered all along the north boundary line of the leased premises and as close to them as the rules of the oil commission would permit the drilling of wells. There is no substantial difference between the situation here presented and that presented in the cases cited.

It is probably impossible to prove definitely that the wells to the north are draining oil from under the leased premises. The Chancellor found that these wells to the north ''have a tendency to drain oil from under the lands involved in this suit.'' The chief geologist of the defendant testified that the chances were that a greater portion of the oil under the leased premises would migrate to the north.

Under the circumstances shown here the defendant cannot retain these leases merely by the payment of delay rentals. Oil has been and is now produced in more than paying quantities upon lands immediately adjoining the leased premises, the wells being as close to it as the rules of the commission will permit. The probability of substantial drainage has been proved.

The appellee has cited several cases in support of its proposition that there is no obligation upon it to develop or protect the leased premises unless there is reason to believe that the proposed offset wells will return to the lessee the cost of drilling and operating the same. Most of these cases are distinguishable on the facts.

In the case of *Eastern Oil Company* v. *Beatty*, 71 Okla. 275, 177 Pac. 104, the court affirmatively found that the proposed offset or protection well would not produce enough oil so that the royalty thereon to the lessor would equal the amount of the delay rentals. The well on the adjoining lands was producing a very small

amount of oil and the price was low. Its conclusion was that under such circumstances it would be most unreasonable to decree a cancellation. The delay rentals in the case at bar are only fifty cents an acre. The wells on the adjoining lands to the north are producing in the neighborhood of 65,000 barrels each, per annum, and are capable of producing more, and the average value of this oil is approximately $1.00 a barrel. There is no comparison in this case between the amount of royalties the lessor would receive in the event there was production and the mere pittance which he is entitled to as delay rentals.

In the case of *Myers* v. *Shell Petroleum Corporation,* 153 Kan. 287, 110 Pac. 2d 810, the relief sought was damages and not cancellation. The court held that in this damage suit the lessee was under no implied duty to engage in an undertaking which is unprofitable to him although it might or would result in some profit to the lessor. The court said further, 110 Pac. 2d 816: "Manifestly, if the lessee thinks an undeveloped portion of his lease cannot be developed with profit to him he may be required to surrender such portion of the lease. That is not the instant case. This is an action for damages for alleged breach of the implied covenant to explore, develop and produce." This case seems to be in line with the Arkansas cases heretofore cited on cancellation.

The case of *States* v. *Phillips Petroleum Company,* 161 S. W. 2d 366, (Texas Court of Civil Appeals, San Antonio, 1942), was a suit for damages for breach of the implied covenant to drill an offset well. The particular lease had been forfeited by the lessee for nonpayment of delay rentals and had been released of record by the lessee before the suit was brought. The lands were located in a gas field of very high pressure where a great deal of trouble had been had in handling the gas. The field had been classified as a gas field and the allowable production fixed accordingly. The price of gas was low and one of the existing wells was supplying the entire market for gas. The distillate which could be produced from the gas which the proposed well would

be allowed to produce was very small in quantity. The wells had to be drilled to a depth of 7,800 feet. Under these circumstances the Texas court held that the lessor was not entitled to damages for failure to drill.

The Chancellor erred in holding that the lessors in this case were not entitled to relief.

Inasmuch, however, as this is the first case in which this specific question has been passed upon by this court, it is fair and equitable that the lessee should be allowed a reasonable time from this date within which to drill on the leased premises. Under present conditions, with restrictions on the supply of necessary pipe and equipment, six months would be a reasonable time. The decree will be reversed and remanded with directions to cancel the leases unless the appellee shall, on or before the expiration of six months from January 18, 1943, commence the drilling of an offset well in search for oil and gas on some part of the leased premises, and shall thereafter continue the same with due diligence until the formations are reached from which oil is now being produced in the offsetting wells to the north of the leased premises.

In the case of one of the leases involved in this suit the lessors owned the surface, but only owned one-half of the minerals and consequently the lease only covered one-half of the minerals. This presents no serious difficulty. Our laws provide means whereby the entire mineral interest can be leased for the benefit of all concerned. See § 10549 of Pope's Digest and § 15 of Act 105 of 1939. No effort has been made to invoke the benefit of such laws. In addition it has been stipulated that the owner of the other one-half interest in the minerals would testify, if he were present, that the appellee agreed with him that if he could get someone to drill on this acreage the appellee would unitize its leases with him for an undivided one-eighth overriding royalty, that he secured an agreement from the Big West Drilling Company that it would drill on this acreage on this basis, and that thereafter the appellee stated that it refused to farm out the proposed drilling unit to the

990

Big West Drilling Company and that the appellee itself would drill such well upon other terms which were not satisfactory to the owner of such mineral interest. Under these circumstances the fact that one of the leases covers only an undivided one-half interest in the minerals is not sufficient justification for the refusal to drill.

The decree is reversed, and the cause is remanded for further proceedings in accordance with this opinion.