## SAULSBERRY *v.* SIEGEL.

4-9891
252 S. W. 2d 834

Opinion delivered November 10, 1952.

Rehearing denied December 22, 1952.

*Neill C. Marsh, Jr., Keith & Clegg* and *Spencer & Spencer,* for appellant.

*J. S. Brooks* and *Mahony & Yocum,* for appellee.

ROBINSON, J. Appellants, C. J. Saulsberry, *et al.,* filed suit to cancel an oil and gas lease and have appealed

from a decree in favor of the appellees, who are owners of a lease executed in 1922; and Saulsberry is the lessee named in a lease executed in 1951 on the same property. The chancellor's decree sustains the 1922 lease and cancels the 1951 lease.

On April 5, 1922, Tennyson Allen and wife, parents of the appellants, Joe Allen and Marion E. Norton, executed to H. M. Johnson, trustee, an oil and gas lease on thirty acres of land, described as the south half of the southeast quarter of the southeast quarter of section 18, township 17 south, range 14 west, Union County, Arkansas, and the northeast quarter of the southeast quarter of the southeast quarter in the same section. The lessees drilled four wells, and perhaps a fifth one, on the thirty acres. These wells were all drilled to what is known as the Nacatoch sand. There was no production of any consequence from any of the wells, except one located on the north ten acres of the tract. According to appellants' contention, this well ceased to produce in 1930. At that time, or at a later date, the derrick was destroyed by fire. In 1934 the well was again put into production and has continued to produce since then. Through various assignments the appellees are now owners of the lease.

In 1951 appellants, Joe Allen and Marion E. Norton, executed to appellant, Saulsberry, a lease on the property. Saulsberry also owned a lease on an adjoining ten acres on which he drilled down to what is known as the Glenrose sand and brought in a good well. This was the first well that had produced oil below the Nacatoch sand, with the exception of what is known as the Stokes well, located about three-quarters of a mile northwest of the property here involved. The Stokes well was drilled about the year 1926 and produced oil for some time thereafter. About fourteen or fifteen other wells were drilled on properties surrounding the Stokes well, none of which was productive. As soon as the appellees learned that Saulsberry was likely to bring in a well in the Glenrose sand, they secured a permit to drill to that sand on the

south twenty acres of their lease; but when this suit was filed, asking that the lease be cancelled on the south twenty acres, but not asking for cancellation of the northeast ten acres, they had the permit amended to permit them to drill to the Glenrose sand on the northeast ten acres and produced a well.

Appellants contend that there has been a complete, or a partial forfeiture of the 1922 lease for three reasons:

(1)—The lease terminated upon cessation of production on the leased premises in 1930;

(2)—If there has not been a termination of the entire lease because of cessation of production, then there has been an abandonment, so far as the south twenty acres are concerned; and

(3)—Lessors were not required to give notice of the forfeiture but, if so required, such notice was given.

As to the first contention made by appellants, that the lease terminated in 1930 due to a cessation of the production of oil, it is not clear from the record just when there was a complete stoppage of production; but accepting appellants' claim that it was for a period extending from 1930 to 1934, the fact remains that the derrick had been destroyed by fire and the lessees rebuilt it, putting the well into production. Apparently lessors made no claim during that time, or for some fifteen or twenty years thereafter, that the lease had terminated by reason of the well being shut down in 1930. Seemingly, the lessors considered that the cessation of production in 1930 was temporary; they made no objection to the lessees rebuilding the derrick and putting the well into production. In fact, they made no claim to the lessees of a forfeiture until the amended complaint was filed in this case, about twenty-one years after the year 1930, the date they now say the lease terminated; and, furthermore, appellants do not even now ask for cancellation of the lease as to the northeast ten acres of the tract on which is located the only well that was producing in 1930, when there was a cessation of all production until 1934.

In the case of *Reynolds* v. *McNeil*, 218 Ark. 453, 236 S. W. 2d 723, this court said:

"The chancellor was right in refusing to declare a forfeiture. The lessee and his assignees had spent large sums in successfully attaining production within the primary term of six months. When that event occurred a valuable estate vested in the lessee, to continue as long as oil or gas was produced in paying quantities.

"The appellants contend, however, that the estate terminated at the end of the primary term because oil was no longer being produced in commercial amounts. According to the weight of authority, and we think the better view, when the lessee's estate has vested it does not automatically terminate upon a temporary cessation of production. In ventures of this kind the lessee makes a very substantial investment and bears the entire loss if the well is unproductive. It would be harsh and inequitable to say that upon a temporary stoppage of production the lessor can declare a forfeiture and take over the property himself. Hence most authorities allow the lessee a reasonable time within which to reinstate paying production. For instance, in a case where the derricks blew down in a heavy storm, and later burned, the lessor was not permitted to declare the lease at an end because his royalties had ceased for the time being."

Next is appellants' contention that the inactivity of the lessees was a breach of the implied covenants of exploration and development as to the south twenty acres. The lessees drilled four wells for certain, and perhaps a fifth one, all to the Nacatoch sand. The test, as to whether there has been a breach of the implied covenant to explore and develop, is whether the lessee has acted with reasonable diligence so as to produce oil and gas upon the entire tract. *Standard Oil Company of Louisiana* v. *Giller*, 183 Ark. 776, 38 S. W. 2d 766. In *Smart* v. *Crow*, 220 Ark. 141, 246 S. W. 2d 432, this court said:

"The lessee must act for the mutual advantage of both the lessor and lessee, and must consider not only

his interest but, also, the interest of the lessor. He must perform the contract so as to further the original purpose and intention of the parties. *Ezzell* v. *Oil Associates*, 180 Ark. 802, 22 S. W. 2d 1015. However, in the Ezzell case, the court said: 'Of course due deference should be given to the judgment of the lessee as operator to determine how many wells should be drilled, but he must use sound judgment in the matter and cannot act arbitrarily. He must deal with the leased premises so as to promote the interest of both parties and to protect their mutual interest.' "

It cannot be said that the lessees did not exercise sound judgment or that they acted arbitrarily. Only one well drilled to a depth lower than the Nacatoch sand which produced any oil was the Stokes well drilled in 1926. This well was located about three-quarters of a mile northwest of the lease here involved; and, moreover, fourteen or fifteen wells were drilled around the Stokes well to the same depth, and none of these wells was productive. A map was introduced in evidence in this case which shows dozens of wells drilled all around and in the immediate vicinity of the lease under consideration. A great majority of all these wells have ceased production. There is no evidence whatever in the record of any existing fact, or theory, whereby it can be said that the lessees have failed to use reasonable diligence, or have acted in an arbitrary manner by not drilling below the Nacatoch sand until Saulsberry had done so on an adjoining tract. Just what fact, or theory, caused Saulsberry to drill to a greater depth is not shown in the record. On this phase of the case appellants rely on *Smith* v. *Moody,* 192 Ark. 704, 94 S. W. 2d 357; but there the situation was entirely different. Three hundred and forty acres were involved in the lease on which there had been drilled only eight wells, seven of those being on the west property line and one on the north. It was the contention of the lessees that other wells could not be drilled and operated on the property except at a great loss. This court said: "This contention may be disposed of by saying that, if true, the lessees have not

been damaged by the cancellation of so much of the contract of lease as cannot be profitably performed.''

In the case at bar at least four wells were drilled on the thirty acres, and at least one well was drilled on each ten-acre tract, with the exception of the southwest ten acres, and that particular area was completely surrounded by non-productive wells. It is settled that the lessee: must act for the mutual advantage of both the lessor and lessee; must perform the contract so as to further the original purpose and intention of the parties; must use sound judgment in the matter and cannot act arbitrarily. Whether the lessee has acted in such manner is to be determined from all the facts and circumstances in the case. Here, after considering such facts and circumstances, the chancellor found in favor of the lessee; and we cannot say the decree is contrary to the preponderance of the evidence.

Finally, appellants say that the lessors were not required to give notice of the forfeiture, but, if so required, such notice was given. Since it is being held that the chancellor did not err in holding there was no forfeiture, notice of appellants' contention, in that respect, is of no consequence.

Affirmed.

Mr. Justice MILLWEE and Mr. Justice WARD dissent.