## AMOCO PRODUCTION COMPANY *v.*
### C. O. "Jack" WARE et al

80-76                                                602 S.W. 2d 620
Supreme Court of Arkansas
Opinion delivered June 23, 1980
Rehearing denied October 2, 1980

316

*Keith, Clegg & Eckert*, and *George G. Gibson*, for appellant.

*Robert J. Moffatt*, Shreveport, La., and *Chambers & Chambers*, by: *Melvin T. Chambers*, for appellees.

DARRELL HICKMAN, Justice. This is an appeal from a Columbia County Chancery decree cancelling an oil and gas lease that the appellant, Amoco Production Company, had been granted by C. O. "Jack" Ware and others.

The chancellor found that the lease should be cancelled because Amoco had breached implied covenants of the lease, had failed to act in good faith and had abandoned the interests of the lessors.

On appeal, Amoco raises four allegations of error, essentially arguing that the chancellor was wrong in his findings. We agree with Amoco that the court was in error in cancelling the lease and reverse the decree.

The particular tract of land involved in this case consists

of about 73 acres and it is located in the South Half of the Southwest quarter of Section 31, Township 19 South, Range 18 West in Columbia County, Arkansas. A consideration of the issues in this case cannot be limited to just those concerning this tract of land because it part of what is called the Chalybeat Springs Oil and Gas Field. That field covered an area of about seven miles in length with a width varying from a half mile to two miles.

In 1971, Amoco drilled in this area and found oil. Thereafter, Amoco and others conducted extensive geological surveys, collecting data and drilling other wells. It soon became apparent that this particular oil field had a gas cap; a formation of natural gas existed on top of the oil formation. This meant that if the gas were drawn off, the oil could not be recovered because the pressure in the natural gas formation was needed to recover the oil.

Therefore, it was decided the only reasonable and prudent way to develop the field and recover the oil and gas from it was to do so by making the entire field one unit, a procedure called unitization. Unitization essentially means that all of those who have a legal interest in the oil and gas join together in a common plan to gain effective production from the field. In this case it was also decided that secondary recovery procedures should be used. Gas from some wells would be withdrawn and reinjected into the formation to maintain pressure in the formation so that oil could be produced from other wells. Amoco held the major working interest in the field. That interest was over 60%. Ware owned royalty interests elsewhere in the field besides the tract in question, and does not question Amoco's dealings regarding those interests.

Before Amoco was able to get a unitization plan approved by the Oil and Gas Commission, Murphy Oil Company filed for a drilling permit in the SW-1/4 of Section 31. Murphy had a lease on most of 80 acres just north of Ware's tract. According to the geological data introduced as evidence in this case, the outer limits of this oil field would

not extend to the land that Murphy had a lease on. About six acres of the north half of this quarter section was depicted as having some of this field beneath it, the remainder having none of the field beneath it — in other words, the Chalybeat Field ended at about Ware's north property line.

A hearing on the drilling permit was held before the Oil and Gas Commission. Amoco was there as well as Ware and others. The Oil and Gas Commission decided that a drilling unit would consist of all the SW-1/4 of Section 31, 160 acres. Effectively, this order meant that Murphy would be able to share in the oil and gas that was beneath Ware's land — if one accepted the geographical data as correct. The Oil and Gas Commission generally determines what a drilling unit is on the basis of acreage rather than geographical formations underneath the earth. Amoco argued strenuously against Murphy, offering evidence that there was little or no oil and gas beneath Murphy's tract and that it would be very unfair to permit Murphy to share in the oil and gas. Ware was at the hearing and testified on behalf of Amoco's position.

Amoco filed a notice to appeal the Oil and Gas Commission's ruling but did not pursue it. Instead it entered into a unitization agreement regarding the field which essentially permitted Murphy to come into the field and share in the oil and gas produced. Amoco presented evidence that Murphy was included simply because the Oil and Gas Commission had already effectively ruled that Murphy could share in the oil and gas produced from the SW -1/4 of Section 31.

Ware sued Amoco alleging that it should have appealed the decision of the Oil and Gas Commission, should not have entered into the unitization agreement, had permitted drainage to occur to his property and asked for money damages and cancellation of the oil and gas lease.

The chancellor concluded that Amoco had permitted drainage to occur to Ware's tract of land but that Ware had acquiesced in the drainage believing that unitization would best serve his interests. Drainage is a term that simply describes the process where one would lose oil and gas beneath his property to wells operating on adjacent prop-

erty. The chancellor declined to award damages for drainage but ordered the lease cancelled. The chancellor found that Amoco assured Ware of protection of his royalty interests and that Ware relied on these assurances; that Amoco abandoned Ware and, in effect, diluted Ware's royalty interest by half; Amoco was solely motivated in furthering its own interests in entering into the unitization agreement and that Amoco, as a lessee, owed a duty to "protect the interest" of the lessor and had breached this duty.

Amoco certainly had a duty to act for the mutual advantage of both Amoco and Ware. However, in determining if Amoco did perform in a reasonable and prudent manner, due deference should be given to the judgment of Amoco, as an operator, regarding how development should proceed. Amoco had to use sound judgment and not act arbitrarily. *Saulsberry* v. *Siegel,* 221 Ark. 152, 252 S.W. 2d 834 (1952); *Poindexter* v. *Lion Oil Refining Co.,* 205 Ark. 978, 167 S.W. 2d 492 (1943).

A preponderance of the evidence shows that Amoco acted at all times as a reasonable and prudent operator, that there was no implied covenant in the lease that was breached, and certainly there is not a preponderance of the evidence that Amoco acted solely in its own interests.

Amoco had a duty to all of the leasehold interests in this field, not just Ware. This duty was divided as to Ware because he had other royalty interests in the oil field. All other interests were best served by unitization.

The fact Murphy was granted a permit to drill a well in this quarter section was a determination of rights, a finding of principle — Murphy could share in the oil and gas produced from the quarter section. Nobody ever deemed a well desirable in the SW-1/4, not Murphy, Amoco, or Ware.

Ware indicated at the Oil and Gas Commission hearing he did not want a well drilled on his 80 acres for two reasons. First, it might produce a dry well and thereby deprive him of any interest in the oil and gas produced from this field. Second, he realized, and it was not disputed, that an oil well

should not be drilled on this 80 acres because of the gas cap. Such a well could not be a profitable producer. A well drilled nearby to Ware's tract was the well that conclusively proved that a gas cap existed, and that well's production was severely limited so that the remainder of the field could be worked and all of the oil and gas effectively recovered. It was not disputed that if a well was drilled into the gas cap and not limited, 1300 barrels of oil a day could be lost.

Amoco did have a small working interest in some of the area to the north of Ware. Ware argues the unitization agreement increased Amoco's interest at the same time Ware's was reduced; that Amoco proposed the unitization agreement considering only its interests. Amoco had over a 60% working interest in the field and owed the same duty to all of its royalty interest holders it owed to Ware. To say that it acted solely on its behalf is to ignore Amoco's obligations to all the royalty holders, as well as itself, and other producers and royalty holders in the Chalybeat Field. Unitization was the only answer for this field and the sooner the better.

After the Oil and Gas Commission ruled against Amoco and Ware, Amoco entered into the unitization agreement. Ware was present when that agreement was presented to the Commission. There is no evidence, aside from the agreement itself, that Amoco acted improperly.

The chancellor found that the lease had an implied covenant for Amoco to "protect the interest" of Ware, and that it breached this covenant. Essentially the chancellor found, that Amoco had a duty and obligation to appeal the Oil and Gas Commission's decision to a court of last resort. We find no such implied duty or obligation in the lease nor from the facts in this case.

The parties had a comprehensive oil and gas lease with the usual provisions and expressed covenants. An implied covenant is one that may be reasonably inferred from the whole agreement and the circumstances attending its execution. They are not favored by the law and can be justified only upon the ground of legal necessity arising from the terms

of the contract and the circumstances attending its execution. 20 Am. Jur. 2d, Covenants, § 12.

According to a leading authority in the field of oil and gas law, there are essentially five types of implied covenants in oil and gas leases: A covenant to drill wells within a reasonable time, testing the land for oil and gas; a covenant to drill test wells within a reasonable time after notice; a covenant, if oil or gas be found in paying quantities, to proceed with reasonable diligence in drilling sufficient number of wells to reasonably develop the premises; a covenant to protect the land from drainage through wells on adjoining lands, by drilling offset wells; and, a covenant to market the produce of producing wells. Summers, *The Law of Oil and Gas,* Chpt. 13, § 395 (Vol. 2, 1959).

We find no authority for the type of implied covenant the chancellor imposed in this case.

It may be the chancellor meant in this case that from the facts and circumstances, Amoco had misled Ware or had made promises upon which Ware relied to his detriment. We disagree with that judgment. First, there is no evidence at all that Amoco told Ware it would or would not appeal the decision of the Oil and Gas Commission. It did file a notice of appeal and it did withdraw that notice. In neither instance did it notify Ware. Therefore, he was not misled by the simple fact the appeal was not pursued.

Furthermore, Ware himself could have appealed the decision of the Oil and Gas Commission. Ark. Stat. Ann. § 53-120 (Repl. 1971).

Whether the Oil and Gas Commission was right in holding as it did is not before us. To examine that issue would be collateral attack on the order of the Oil and Gas Commission and such an attack is not permitted.

The appellee offered no evidence that Amoco made a "deal" with Murphy to Ware's detriment or did anything except acquiesce in the judgment of the Oil and Gas Commission. There is no evidence at all that the Commission's deci-

sion would be readily reversed by a reviewing court. Amoco simply used its best judgment and proceeded to have a unitization order entered regarding this field in conformity with what the Oil and Gas Commission had already decided — as it related to this particular quarter section of land.

There is a duty for an operator to act reasonably and prudently regarding production. In this case Amoco's judgment regarding this entire field must be considered to determine if it acted reasonably and prudently. At every instance it attempted to prevent waste and proceed with unitization. It is only regarding this one section of land that it is accused of favoring its own interest over that of a lessor. Whether drainage occurred to Ware's oil and gas was sharply disputed. Reviewing the evidence de novo we cannot say a preponderance of the evidence is that drainage did occur to Ware's property.

An almost identical situation occurred in nearby Section 28. Persons holding oil and gas interests in the North Half of the Southwest Quarter of that section were permitted to share on a pro rata basis, according to acreage, with individuals holding an interest in the south half. The geological data for Section 28 is about the same as that for Section 31; it seems the persons holding interests in the north half will share, to their advantage, with those holding interests in the south half. So Ware's situation was not unique.

It is suggested that no one holding an interest outside the geological perimeter of the field should be permitted to share in the proceeds. That is a nice concept. However, drilling units and unitization are normally, if not always, determined by acreage, and not by geographical lines that indicate whether oil may or may not be under the surface. What lies underneath the ground cannot be determined exactly unless wells are drilled. We cannot review the Commission's finding in this appeal; we cannot say it was absolutely wrong for the Commission to allow Murphy to share in the production.

Ware's posture in this case is essentially that he wants the best of all possible worlds. He did not want a well drilled on his land because it might deprive him of his royalty if the

hole were dry; also, he knew that a well drilled would not be productive because of the gas cap. Nor did he want any adjacent property owners to share in the production. Amoco had a choice, after the permit was granted to Murphy, to either drill the well or permit Murphy to drill it at an extreme penalty to Amoco. Either way, Amoco lost and Ware lost. Nobody wanted the well, only the benefits if the field were unitized. Ware argues that Amoco's loss was diminished when the unitization agreement was approved; that unitization cut Amoco's losses. That may be true, but that alone is insufficient to support a finding of self-dealing. If unitization had not been approved and if the case had been appealed to a court of last resort, whatever that court may be, it could have worked to a greater detriment to both Amoco and Ware. Furthermore, it would obviously have worked to the detriment of the other parties, including Ware, who had an interest in the field. The evidence indicates that the reasonable and prudent thing to do is exactly what Amoco did.

Ware argued at the trial level and on appeal that Amoco acted in bad faith throughout this entire period of time. At one point Ware argued that Amoco damaged him by delay in appealing the decision of the Oil and Gas Commission. Now Ware is arguing that it was wrong not to appeal the decision of the Oil and Gas Commission. There were numerous allegations of bad faith and misconduct on the part of Amoco but there was no evidence to support those allegations. Ware testified that any promises that were made were brought out in the testimony before the Oil and Gas Commission. We have examined the record and we can find no promise Amoco made that Amoco had the power to fulfill that was not done or diligently pursued.

For the reasons stated, we must conclude the findings are clearly erroneous and the decree is reversed.

Reversed.