SUNBELT EXPLORATION CO., Harold Oliver, Mabel Oliver,
Donald Newton, Arlaween Newton, Drucilla Jones,
Shelvon Gregory, and Stanley Gregory
*v.* STEPHENS PRODUCTION CO. and Chevron U.SA, Inc.

94-1233                                        896 S.W.2d 867

Supreme Court of Arkansas
Opinion delivered April 10, 1995

300

*Dorsey Ryan* and *Matthew Horan*, for appellants.

*Daily, West Core, Coffman & Canfield*, for appellees.

TOM GLAZE, Justice. This case involves oil and gas leases and, as such, the facts leading to the present appeal are lengthy and complicated. Because the facts are important to our decision, they are set out below as simply as possible.

In the 1950s, the appellees Stephens Production Co. and Chevron USA, Inc. acquired oil and gas leases in the Arkoma Basin from the appellant lessors' predecessors in title. The leases provide for the payment of royalties on the basis of market value, with the royalties constituting the lessors' chief consideration for conveying their rights in the leaseholds. All of the land covered by the leases at issue were pooled by the Arkansas Oil and Gas Commission into the Gregory Unit. The Gregory Unit is adjoined by three other units, the Blakely Unit, the Gooch No. 1 Unit, and the Gooch No. 2 Unit. Stephens also holds all the leases in the adjoining three units, and the Gregory Unit lessors also own mineral interest in one or more of the adjoining three units. All four units, the Gregory, Gooch Nos. 1 and 2, and the

Blakely, share a number of reservoirs at various depths which contain natural gas. The subject of this suit is the Dunn C or Paul Barton reservoir, (hereinafter the Dunn reservoir), which lies underneath all four units.[1]

In 1959, Stephens drilled the Gregory No. 1 well in the Gregory Unit, and in 1971, Stephens recompleted the Gregory No. 1 at two additional depths to reach the R. Barton and Dunn reservoirs.[2] At the time, it was not known that the Dunn reservoir contained a fault located under the Gregory Unit which was caused by the breaking of the rock planes. The result of this fault was to divide the reservoir into two parts, trap the gas, and prevent the Gregory No. 1 well from producing or draining gas from the southern portion of the Dunn reservoir. No other wells were drilled in the Gregory Unit for more than thirty years. In 1961, Stephens and Chevron drilled a well in the Blakely Unit that produced from the Dunn reservoir, and between November 2, 1961, and September 17, 1985, they drilled offset wells in the Gooch units which produced gas from the Dunn reservoir on the south side of the fault.[3]

In the late 1980s, appellant Sunbelt Exploration Company began looking for prospects in the Arkoma Basin. Not realizing that the Paul Barton and Dunn C reservoirs were one and the same and, thereby, concluding that Stephens and Chevron had abandoned their leaseholds in the Gregory Unit, Sunbelt purchased top leases from all the appellant Gregory Unit lessors. *See Crystal Oil Co. v. Warmack*, 313 Ark. 381, 855 S.W.2d 299 (1993) (top lease defined). By letter dated July 6, 1990, Sunbelt informed Stephens that Stephens' and Chevron's leases in the

---

[1]The Dunn reservoir was denominated the Paul Barton at the Gregory No. 1 well and denominated the Dunn C on the other units. This fact added to the confusion because the Paul Barton and the Dunn C were considered to be two separate reservoirs at one time.

[2]The term, recompleted, refers to the "technique of drilling a separate well-bore from an existing casing in order to reach the same reservoir, or redrilling the same well bore to reach a new reservoir after production from the original reservoir has been abandoned." Howard R. Williams & Charles J. Meyers, *Manual of Oil and Gas Terms* 811 (7th ed. 1988).

[3]An offset well is "a well drilled on one tract of land to prevent the drainage of oil or gas to an adjoining tract of land, on which a well is being drilled or is already in production." *Oil and Gas Terms* at 634.

Gregory Unit were subject to judicial termination, and requested that Stephens release the undeveloped balance of the unit for exploration and production by Sunbelt. On July 11, Stephens responded that it was planning to drill in the unit and would do so.

Subsequently, in October 1990, Stephens completed drilling the Gregory No. 2 well which reached the Orr reservoir and provided conclusive information that the Dunn reservoir did contain a fault. As a result, Stephens drilled the Gregory No. 3 and No. 4 wells for additional production of the Orr reservoir and the Dunn reservoir south of the fault. Chevron did not participate in the drilling of the three new wells, and instead entered into farm-out agreements with farmees who were unaware of Sunbelt's actions.[4]

In June 1991, Sunbelt filed suit in federal court against Stephens and Chevron. That suit was dismissed for failure to join the lessors as indispensable parties. Subsequently, Sunbelt entered into agreements with the lessors that allowed Sunbelt to sue Stephens and Chevron, share any award with the lessors, and hold the lessors harmless for any litigation costs.

On November 26, 1991, Sunbelt and the lessors filed their complaint in circuit court against Stephens and Chevron "to try title" of the Gregory Unit leases, ejectment of Stephens as a trespasser, damages, an accounting, and other relief. Sunbelt[5] also claimed abandonment of the leases by Stephens, breach of the implied covenant to explore and further develop, and breach of express covenants to develop and protect from drainage. Finally, Sunbelt requested a declaratory judgment that the top leases it held were effective from the date of taking, and that the old leases with Stephens were abandoned effective that same date. In sum, Sunbelt requested judicial cancellation of Stephens' and Chevron's leases so that its top leases would then become effective. Excep-

---

[4]A farm-out agreement is an assignment by a leaseholder to another operator wherein the assignee is obligated to drill on the acreage as prerequisite to transfer of the leaseholder's interest. Williams & Meyers, *Oil and Gas Terms* at 342.

[5]To provide for easier reading, Sunbelt is used to represent both Sunbelt and the lessors, and Stephens is used to represent both Stephens and Chevron. Exception occurs where it is necessary to identify a distinct interest of the lessors or Chevron.

tions were made for the Gregory No. 1 well and the rights of Chevron's farmees in the Gregory Nos. 2, 3, and 4 wells. Stephens and Chevron filed separate answers both challenging circuit court's subject matter jurisdiction, claiming Sunbelt's action was not to try title, but instead was for cancellation of oil and gas leases, and requested transfer to chancery court. Further, Stephens denied any breach or trespass, and pled affirmative defenses.

On May 12, 1993, the circuit court granted Stephens' motion to transfer to chancery court. Other motions were filed by the parties and other orders were entered which are not at issue on appeal.

The case was tried before the chancellor January 10 through 12, 1994. On May 11, following submission of post-trial briefs, the chancellor entered his judgment and opinion in favor of Stephens and Chevron, and dismissed Sunbelt's complaint with prejudice. On that same date, the chancellor entered an order *nunc pro tunc* modifying a clerical error in his judgment and opinion. On June 3, Stephens filed a motion for award of attorneys' fees. On July 5, the chancellor entered an order holding that he had jurisdiction of the matter and allowed Sunbelt to submit additional arguments. By opinion entered July 7, the chancellor awarded attorneys' fees against Sunbelt only and in favor of Stephens in the amount of $67,440.38 and in favor of Chevron in the amount of $19,621.47. Sunbelt appeals from the circuit court order of transfer, the chancellor's judgment and opinion, and the award of attorneys' fees.

First, we consider Sunbelt's challenge to circuit court's order of transfer and chancery court's jurisdiction over this matter. Sunbelt argues that because its complaint requested a writ of ejectment, the circuit court had jurisdiction and cites for support *Henry* v. *Gulf Refining Co. of La.*, 176 Ark. 133, 2 S.W.2d 687 (1927). There, the lessee brought action in circuit court in ejectment against Gulf, where the lessee claimed the right to possession under mineral leases. However, *Henry* is distinguishable from the present case because in *Henry*: (1) there was no challenge to the court's jurisdiction, (2) the case involved determination of whether the lessee had performed under the express terms of the leases, (3) the parties claimed under a common source of title, (4) the lessee had been ousted from possession,

and (5) the lessee was seeking adjudication of title and restoration of possession.

■ Here, Sunbelt does not contend Stephens' interest in the Gregory Unit terminated automatically under the terms of the lessors' leases with Stephens. Further, Sunbelt, by its own admission, held only top leases which by their definition are inferior to the original leases held by Stephens. *See Crystal Oil Co. v. Warmack,* 313 Ark. 381, 855 S.W.2d 299 (1993). Sunbelt's interest under a top lease cannot become effective until either Stephens concedes abandonment and voluntarily relinquishes possession, or there is a judicial determination that Stephens' leases are cancelled.

■■ Cancellation of an oil and gas lease is an equitable remedy and is appropriate when a breach of the implied covenant of reasonable development is shown. *Robertson Enterprises, Inc. v. Miller Land & Lumber Co.,* 287 Ark. 422, 700 S.W.2d 57 (1985); *Blair* v. *Clear Creek Oil & Gas Co.,* 148 Ark. 301, 230 S.W. 286 (1921). Cancellation of instruments is one of the well-recognized grounds of equity jurisdiction. *American Ins. Co.* v. *Mountain Home Sch. Dist. No. 9,* 300 Ark. 547, 780 S.W.2d 557 (1989). Although Sunbelt mentions ejectment in its complaint, the complaint necessarily speaks in terms of cancellation of Stephens' leases. Considering the required remedy in these matters, we believe Sunbelt's request for a judicial determination of cancellation was both appropriate and controlling. And finally, we note that subject matter jurisdiction is determined from the pleadings. *Union Pacific R.R. Co.* v. *State Ex. Rel. Faulkner County,* 316 Ark. 609, 873 S.W.2d 805 (1994).

■ Having determined that jurisdiction was properly in chancery, we turn to Sunbelt's appeal from the chancellor's decision on the merits. At trial, Sunbelt alleged Stephens acted imprudently by failing to recomplete the Gregory No. 1 well earlier than 1971, by failing to discover the Dunn fault before 1990, and by failing to prevent drainage.

In his opinion and judgment on the merits, the chancellor held there was no evidence indicating that Stephens acted imprudently in not recompleting the Gregory No. 1 well to the Dunn reservoir prior to 1971. He found the evidence was essentially uncontroverted that in 1959, when the Gregory No. 1 was drilled,

the technology was not available to show whether significant amounts of gas existed in the Dunn reservoir. Further in 1971, it was only Stephens' implementation of extraordinary measures which allowed production of a significant amount of gas from the Dunn reservoir.[6] Additionally, the chancellor found no evidence that Stephens' failure to find the fault prior to 1990, or to drill additional wells south of the fault to prevent drainage was due to imprudent management.[7] The chancellor held that the issue as to the amount of drainage by the Blakely and Gooch wells, if any, was moot because of his determination that Stephens had acted prudently in its management of the Gregory leases. While normally the question of whether a lessee acted as a prudent operator in its management goes to the entire acreage within the leasehold, the chancellor limited his ruling only to Stephens' management of the Dunn reservoir.

On appeal, Sunbelt argues the chancellor erred by applying the prudent operator standard to both its claims for damages from drainage and to its claim for cancellation of Stephens' leases in the Gregory Unit. Because Stephens is a common lessee with the adjoining units whose wells allegedly drained gas from the Gregory Unit, Sunbelt contends the chancellor should have placed the burden on Stephens to prove its diligence, rather than requiring Sunbelt to prove Stephens was a imprudent operator.

This court has noted there are five types of implied covenants in oil and gas leases, among which are the covenant to proceed with reasonable diligence in developing the leasehold, and the covenant to protect the leasehold from drainage from wells on adjoining lands through drilling offset wells. *Amoco Production Co.* v. *Ware*, 269 Ark. 313, 602 S.W.2d 620 (1980). The duty of the operator-lessee is to act reasonably and prudently regarding how development should proceed, and while the judgment of the operator can be considered when determining whether the operator acted reasonably, he must act with sound judgment

---

[6] The measures used included sandfracing and commingling of gas from the Dunn A and Dunn C reservoirs. Sandfracing is an "operation designed to loosen or break up tight formations which contain oil or gas, thus causing such formations to have more permeability and greater production." *Oil and Gas Terms* at 880.

[7] Because gas is migratory in nature and will move from a higher to lower pressure, gas which was originally under one unit can be drained by a well placed on another unit.

and not arbitrarily. *Id.* One measure of whether an operator acts reasonably is whether he acts with due diligence for the benefit of both himself and the lessor. *Id. See also Crystal Oil Co.* v. *Warmack,* 313 Ark. 381, 855 S.W.2d 299 (1993); *Enstar Corp.* v. *Crystal Oil Co.,* 294 Ark. 77, 740 S.W.2d 630 (1987); *Byrd* v. *Bradham,* 280 Ark. 11, 655 S.W.2d 366 (1983); *Ezzell* v. *Oil Associates, Inc.,* 180 Ark. 802, 22 S.W.2d 1015 (1930); *Mansfield Gas Co.* v. *Alexander,* 97 Ark. 167, 133 S.W. 837 (1911).

■ While Sunbelt cites other jurisdictions where the burden is placed on the operator to prove excuse for significant delay in drilling where the operator also owns the draining well, such is not the law in Arkansas. Under Arkansas case law, the burden of proving breach of an implied covenant is on the one seeking cancellation of the lease. *Blair,* 148 Ark. 301, 311, 230 S.W. 286, 289-90 (1921).

The evidence revealed that the Arkansas Oil and Gas Commission does not allow production by more than one well per unit from a common source or reservoir, absent the existence of a fault. Because Stephens began producing from the Dunn reservoir with its recompletion in 1971, it was Sunbelt's burden to show that Stephens' failure to produce from the reservoir prior to 1971, and its failure to discover the Dunn fault was a breach of Stephens' duty as a prudent operator. No evidence was presented to show that Stephens should have developed the Dunn reservoir or should have realized the Blakely well was producing from the same reservoir prior to the 1971 recompletion.

The uncontroverted evidence showed Stephens did not breach its duty in not discovering the Dunn fault prior to 1990. John Shields, an independent geologist who made maps for Stephens in the 1970s, testified he realized a section in the Gregory No. 1 well might be a fault, but because the section was only one hundred feet, he considered it insignificant and representing a thinning of the reservoir. Sunbelt's own geologist, Dr. Charles Bartlett, testified he missed the fault in 1981. John Sharp, a geologist who did mapping for Stephens from 1986 to 1990, testified he noticed one hundred feet missing from the Gregory No. 1 well and realized it was probably a fault. Because he could not tell which direction the fault ran, Sharp recommended that Stephens drill into the Orr reservoir.

G.H. Porter, Jr., vice president in charge of drilling and production at Stephens, testified that through the years the shut-in pressures for the Blakely, Gregory No. 1, and the two Gooch wells were very close, indicating they were all in the same reservoir without any fault separation. Further, Porter stated on May 14, 1990, when John Sharp informed Stephens that a fault existed and recommended drilling, Stephens applied to the Arkansas Oil and Gas Commission for approval of an exceptional location, which was granted. The Gregory No. 2 well was drilled to the Orr reservoir and supplied conclusive evidence that a fault existed within the Dunn reservoir. Subsequently in 1991, Stephens began production in the Gregory Nos. 3 and 4 wells.

Next, we consider whether Stephens breached its duty as a prudent operator in failing to drill offset wells to the Dunn reservoir. While Sunbelt and the lessors alleged loss of gas and royalties from drainage, Sunbelt failed to prove the lessors actually sustained losses. Again, the uncontroverted evidence indicated Stephens produced or will produce all the gas originally in place under the Gregory Unit, plus more. Dave Kvach, a petroleum engineer and Sunbelt's own witness, testified that 164% of the gas originally in place north of the fault was produced, and that the Gregory Nos. 2, 3, and 4 wells will produce 30% to 40% more than was originally in place south of the fault. Henry Coutret, a consulting petroleum engineer and witness for Stephens, testified that after the recompletion in 1971, migration of gas north of the fault went back onto the Gregory Unit. Coutret conceded that if Stephens had drilled the Gregory No. 2 well earlier it would have produced more gas. However, Coutret also stated that of about three billion cubic feet of gas in place initially south of the fault, the Gregory No. 2 well alone will produce approximately two billion.

██ Although the appellate court tries chancery cases *de novo* on appeal, it will not reverse the findings of a chancellor unless they are clearly erroneous. *Perry* v. *Nicor Exploration*, 293 Ark. 417, 738 S.W.2d 414 (1987). Based on the evidence as discussed, we cannot say the chancellor erred in finding that Stephens acted as a prudent operator in its management of the Dunn reservoir within the Gregory unit, and that Sunbelt failed to prove Stephens breached any implied covenants in the Gregory leases.

Finally, Sunbelt challenges the chancellor's award of attorneys' fees to Stephens and Chevron based on three arguments, only one in which we find any merit. The chancellor awarded fees pursuant to Ark. Code Ann. § 16-22-308 (Repl. 1991), which reads as follows:

> In any civil action to recover on an open account, statement of account, account stated, promissory note, bill, negotiable instrument, or contract relating to the purchase or sale of goods, wares, or merchandise, or for labor or services, or breach of contract, unless otherwise provided by law or the contract which is the subject matter of the action, the prevailing party may be allowed a reasonable attorney's fee to be assessed by the court and collected as costs.

Here, Sunbelt brought action against Stephens and Chevron based upon its top leases and requesting that Stephens' leases be cancelled because Stephens had abandoned its leases and breached its implied duties to explore and develop and to protect from drainage. Under the plain terms of § 16-22-308, Stephens and Chevron prevailed against Sunbelt's allegations that they breached their lease terms, and the trial court was therefore authorized to award reasonable attorney's fees in these circumstances.

Sunbelt also argues that, under ARCP Rules 52(b) and 59(b), Stephens' and Chevron's motions for attorneys' fees were untimely because their motions were filed more than ten days beyond the filing of the final judgment dismissing Sunbelt's and the lessors' case. Those rules do not mention when motions for attorneys' fee must be submitted. Instead, this court's holding in *Alexander* v. *First Nat'l Bank of Ft. Smith*, 278 Ark. 406, 646 S.W.2d 684 (1983), controls that issue here. In *Alexander*, the court rejected Alexander's argument that the trial court was without jurisdiction to award attorneys' fees, since at the time of the award, the notice of appeal had been filed. The court held matters that are collateral or supplemental to the trial court's judgment are left within the trial court's jurisdiction even though an appeal has been docketed. In so holding, the court upheld the trial court's award of attorneys' fees and executor's fees since the awards were collateral to Alexander's appeal from the lower

court's decision to uphold First National Bank's accounting. In accordance with *Alexander*, we conclude that Stephens' and Chevron's motions were not required to be filed within the ten-day period set out in Rules 52(b) and 59(b), and the trial court had the authority to award the attorneys' fees it did. *Cf. Spring Creek Living Center* v. *Sarrett*, 318 Ark. 173, 883 S.W.2d 820 (1994), (court held that the trial court could retain jurisdiction of an ARCP Rule 11 motion for sanctions as a collateral matter to the underlying cause of action which had been appealed).

In conclusion, Sunbelt challenges the award of attorneys' fees as excessive, but we find that argument without merit. The trial court's award will not be set aside except for abuse of discretion, *Chrisco* v. *Sun Industries, Inc.*, 304 Ark. 227, 800 S.W.2d 717 (1990), and in reviewing the record, Sunbelt simply fails to show such an abuse. Sunbelt is correct, however, that only costs authorized by statute may be awarded. Stephens and Chevron submitted an itemization of legal fees and costs, which included depositions, expert fees and travel expenses. Because such costs are not allowable, *see Wood* v. *Tyler*, 317 Ark. 319, 877 S.W.2d 582 (1994), we remand so the trial court can deduct those unallowable expenses if such expenses were included in the amount awarded Stephens and Chevron.

Affirmed and remanded in part.