Calvin RIEDEL and Linda Riedel, husband and wife, and Peggy Sturgis, a widow, on behalf of themselves and all others similarly situated, Plaintiffs

v.

XTO ENERGY INC., Defendant.

No. 4:07–CV–00304GTE.

United States District Court,
E.D. Arkansas,
Western Division.

April 28, 2009.

Stephanie M.L. Bowden, Warren F. Young, Young, Bowden & Bailey, Inc., P.C.,

Tulsa, OK, Thomas P. Thrash, Thrash Law Firm, Little Rock, AR, for Plaintiffs.

Mark Banner, Hall, Estill, Hardwick, Gable, Golden & Nelson, P.C., Tulsa, OK, Todd L. Newton, Mitchell, Williams, Selig, Gates & Woodyard, P.L.L.C., Little Rock, AR, for Defendant.

### MEMORANDUM OPINION AND ORDER DENYING CLASS CERTIFICATION

GARNETT THOMAS EISELE, District Judge.

Presently before the Court is Plaintiffs' Motion for Class Certification. The issues pertaining to class certification have been fully briefed. In addition to the motion and response papers, the record includes Defendant's surreply brief and Plaintiffs' reply brief, citation to supplemental authorities and second citation to supplemental authorities. On April 10, 2009, the Court had the benefit of several hours of excellent oral arguments during a hearing on the certification issue.[1]

After careful consideration of the motion papers, applicable law, and oral argument, the Court concludes that Plaintiffs' motion must be denied. Plaintiffs' counsel describes the case as simple and clear-cut, but the Court respectfully disagrees. The Court concludes that Plaintiffs have failed to carry their burden to satisfy the requirements of Fed.R.Civ.P. 23. Class certification must therefore be denied.

### I. OVERVIEW

Plaintiffs Calvin Riedel, Linda Riedel, and Peggy Sturgis bring suit against XTO Energy, Inc. ("XTO")[2] seeking damages on behalf of themselves and a class of similarly situated royalty interest owners in natural gas producing wells in Arkansas operated by XTO that have entered into uniform oil and gas leases, the terms of which require XTO to pay a royalty based on a percentage of the "proceeds" or "gross proceeds." Plaintiffs allege that XTO has improperly deducted from their royalty payments expenses for transportation, compression, dehydration and treatment in violation of Arkansas law. Plaintiffs seek money damages and/or injunctive relief.

Plaintiffs propose certification of two classes of royalty owners. They present two alternative dates for the claims period, one to commence on July 1, 1998, and the other to commence on March 1, 2002, depending on whether the Court permits certification of the fraudulent concealment issue. XTO allegedly began unlawfully deducting transportation costs on July 1, 1998, and Plaintiffs claim that it fraudulently concealed its unlawful actions such that the limitations period should be tolled.

The following class definitions are proposed:

*Class 1:* All royalty owners who (1) have entered into Oil and Gas Leases, with or which have been assigned to or acquired by XTO, conveying oil and gas interests in the State of Arkansas, containing a royalty clause, which provides that lessee will pay lessor royalty for the gas sold based on a percentage "of the proceeds;" (2) on wells for which XTO is the operator; and (3) who, during the Class Period beginning July 1, 1998 (or, alternatively, March 1, 2002) to the present date, were paid royalties by XTO from which charges described as transportation were deducted;

and

*Class 2:* All royalty owners who (1) have entered into Oil and Gas Leases, with or which have been assigned to or acquired by XTO, conveying oil and gas interests in the State of Arkansas, containing a royalty clause, which provides that lessee will pay lessor for the gas sold based on a percentage "of the gross proceeds;" (2) on wells for which XTO is the operator; and (3) who, during the Class Period beginning July 1, 1998 (or, alternatively, March 1, 2002) to the present date, were paid royalties by XTO from

---

1. The hearing has been transcribed. A transcript of the hearing is filed in the case as Docket No. 59. Throughout this Order, the Court refers to the hearing transcript as "Tr. at ——."

2. XTO was formerly known as Cross Timbers Oil Company.

which charges described as transportation were deducted.[3]

Following the April 10th hearing, Plaintiffs' counsel indicated that the class definition should be further modified to exclude from either class, "any lease that specifically authorizes the deduction of transportation or gathering costs."

Plaintiffs state that XTO began deducting transportation, compression, dehydration and treatment costs from class members' royalty payments on July 1, 1998. Plaintiffs further state that there is a factual issue as to whether XTO fraudulently concealed the true nature of the deductions by providing misleading, confusing and conflicting information pertaining to the deductions in order to prevent Plaintiffs and class members from discovering and understanding the true nature and basis for the deductions. Additionally, Plaintiffs state that XTO withheld and failed to disclose what they describe as a "fictitious gas purchase contract" entered into by XTO with its subsidiary (or affiliate), Cross Timbers Energy Service ("CTES"), and the terms of the gas sales necessary to determine the true nature of the fees deducted from the royalty payments. Thus, Plaintiffs contend that all royalty owners who are Class Members from July 1, 1998, forward should be included in the class, as the statute of limitations should be tolled and XTO should be precluded and estopped from raising a limitations defense. Plaintiffs' First Amended Complaint contains the following counts: breach of contract; breach of implied covenant; violation of the Arkansas Deceptive Trade Practices Act; unjust enrichment, fraud, fraudulent concealment; negligence and gross negligence; accounting; breach of duty; and conversion. The same acts and omissions by XTO are alleged to provide a basis for all of the claims of unlawful conduct. In the Court's view, all of Plaintiffs' other claims are dependent on the success of their breach of contract claim, and the contract issues will be central to the presentation of any of the other claims at trial. For example, if Plaintiffs' were to proceed solely on the fraud claim, the contractual relationship between the parties would still be a central focus at trial as it would bear directly upon the misrepresentation and reliance issues. For this reason, in undertaking the required Rule 23 analysis, the Court does not find it necessary in this particular case to distinguish among the various legal claims asserted by Plaintiffs.

## II. BACKGROUND

### A. *History of Natural Gas Production in Arkansas*

The Court begins with a history of natural gas production and related leases in Arkansas because an understanding thereof is necessary to provide the context for the legal analysis the Court must conduct in deciding the class certification issues.

Prior to the hearing, the Court wrote to the parties and identified various issues for the parties to address. The Court specifically asked the parties to describe the age of the royalty contracts at issue in this case.[4] During the hearing, Plaintiffs' counsel indicated that the same "standard form leases" were used in the 1970s, 1980s, and 1990s and that such leases would represent the "vast majority" of the leases XTO acquired on or about July 1, 1998. The lease forms, as Plaintiffs' counsel described them, could be classified into four forms: (1) gross proceeds; (2) market value; (3) fixed price; or (4) net proceeds leases. Plaintiffs' counsel pinpointed the date of July 1, 1998, as the date on which XTO acquired existing production leases.[5] Defendant's counsel disagrees, stating that there is no magic in that particular date as XTO acquired the leases over a period of

---

3. The "gross proceeds" lease language necessary to identify Class 2 members has been changed from the originally proposed definition of royalty owners paid on a percentage "of the gross proceeds received for the gas sold" to those paid on a percentage "of the gross proceeds." Alternatively, Plaintiffs state that Class 2 could be subdivided to separate the two operative forms of royalty clauses rather than including same in one class. See Pl's Reply, Docket No. 43, at p. 11.

4. *See* Letter Order dated March 19, 2009, Docket No. 55.

5. Tr. at 4–5.

time during the late '90s, not by one acquisition, but by a series of acquisitions.[6]

XTO's counsel also disputed Plaintiffs' description of the leases at issue, stating that in fact there are "an incredible multitude of ... [lease] forms and provisions" with "different addendums" and "different terms and conditions." He further stated that because of the changes in the industry over this thirty year period, and the different parties that were entering into leases, there was no "rhyme or reason" as to lease language or provisions.[7]

The Court, in its March 19th Letter Order, also asked the parties to comment on the changes in industry practices over the years. XTO's attorney was able to provide a more comprehensive statement of such history. He described the history of the development of oil and gas properties in Northwest Arkansas and the related lease arrangements. That development started around 1900 with some wells in western Arkansas in counties around Fort Smith and in the Arkansas River basin. This was the first area of sustained natural gas production in Arkansas.[8]

Many leases were entered into during the 1950s and 1960s. Once a producing well is drilled on leased property, the production holds the lease in place. In the late 1970s and early 1980s an oil shortage occurred, leading to another growth of oil and gas activity in Western Arkansas. Many of the wells drilled then are also still in production under leases entered into during that period.[9]

XTO, formerly Cross Timbers Oil Company, came into Arkansas in the late 1990s, and, by a series of acquisitions from other companies, obtained most of the leases at issue in this case. According to XTO's counsel, these acquisitions occurred over time in the late 90s and not on one date (July 1, 1998) as suggested by Plaintiffs.[10] Thus, XTO did not contract directly with the pre-July 1, 1998 lease holders. Rather, it "inherited the lease files, the division order files, all the paperwork related to those producing areas from these companies that had gone out and taken the leases originally." [11]

Thus, XTO was already operating in Arkansas when the new oil and gas play, called the Fayetteville shale, was discovered in approximately 2003. This generated new leasing activity in which new leases were created and new wells were drilled. XTO's counsel describes such leases as "modern era" leases.[12]

Such "modern era" leases, defense counsel stated, will likely specifically address the issue of post-production deductions.[13] Older leases did not because under industry standards at that time it was customary for all gas to be sold "at the well" and there was therefore no need to address post-production costs.

During the oral argument, the Court read an example of a "modern era" royalty lease form described in a law review article, *to-wit:*

> For all oil and gas substances that are physically produced from the leased premises, [ ... ] and sold, lessor shall receive as a royalty a certain percentage of the sales proceeds actually received by the lessee or, if applicable, its affiliate, as a result of the production—as a result of the first sale of the affected production to an unaffiliated party *less this same percentage share of all post-production costs* and the same percentage share of all production, severance and ad valorem recommend taxes. As used in this provision, post-production costs shall mean all costs actually incurred by lessee or its affiliate and all losses of produced volumes whether by use as fuel, line loss, flaring, venting or otherwise from and after the wellhead to the point of sale. These costs include without limitation all

---

6. Tr. at 59–60. Plaintiffs contend that July 1, 1998, is the *primary* date that XTO began doing business in Arkansas following the acquisition of a company holding Arkansas oil and gas leases. Tr. at 112.

7. Tr. at 61–62.

8. Tr. at 59.

9. *Id.*

10. Tr. at 59–60.

11. Tr. at 60.

12. Tr. at 59–60.

13. Tr. at 61.

costs of gathering, marketing, compression, dehydration, transportation, removal of liquid or gaseous substances or impurities from the affected production and any other treatment or processing required by the first unaffiliated party who purchases the affected production.[14]

Defendant's counsel described the industry's evolution from the 1950s through the 1980s, as follows:

> ... Historically, in the oil and gas industry, if we go back into the 1950s, '60s, '70s, early '80s, what we saw in the industry was there were these large interstate natural gas pipelines. The one that's probably most predominant in this area would be Arkansas Louisiana Gas Company at that time, Arkla, and they had large interstate pipelines.... And companies like Arkla were federally regulated[.][T]he Federal Energy Regulatory Commission oversaw them. They shipped gas all over the country wherever their markets were.
>
> What they would typically do when they would come into Arkansas is ... they would lay a gathering line to an individual well[.] [W]hen it had been drilled and was ready for production they would tie in with that gas well, and then they would enter into a contract with the producer which was typically a long term gas purchase contract, usually 20 years or more, whereby the producer would commit the gas from that well to the pipeline to Arkla for Arkla to purchase, and Arkla would purchase it at the wellhead, and by the consideration for Arkla laying that gathering line to the producer was that the producer would in turn commit this gas for a long period of time ... [15]

In this scenario, Arkla purchased the gas at the wellhead after laying the gathering line to the well. So, Arkla would be purchasing gas at the wellhead from a number of producers pursuant to these long-term contracts. Arkla would then take the gas to its various markets.

In the 1980s this approach had to be abandoned because of a series of regulatory orders issued by the Federal Energy Regulatory Commission (FERC) which completely changed how business was done in the natural gas industry. In effect, FERC said companies like Arkla could no longer be purchasers of natural gas. Rather, the large gas pipeline companies, such as Arkla, would thereafter be common carriers, *i.e.,* they would be shipping other parties' gas, not their own. In return, the common carrier (Arkla) would be allowed to charge a transportation rate to recover its investment. In addition, FERC ordered the pipeline common carriers to sell off, or spin off, their gathering systems. The entity acquiring the gathering system would then be permitted to charge other parties for allowing them to ship gas on its gathering system.[16]

As the Court noted previously, Plaintiffs' counsel has proposed to limit the class definition to "exclude any lease that specifically authorizes the deduction of transportation or gathering costs." It appears that such leases, based upon the standard modern era lease, would have specifically permitted the challenged deduction of post-production costs. It is very unlikely that the older leases would have addressed the issue because post-production expenses were simply not an issue at that time. Under the class definition Plaintiffs propose, the Court will be called upon to interpret older leases that do not specifically address post-production expenses and which were negotiated by a number of different lessees over a period of many years.

### B. *How XTO Markets Gas in Today's "Modern Era"*

XTO's counsel described the two different ways that it markets gas in this modern era. In the first scenario, XTO sells gas at the

---

14. Tr. at 5–7 (*quoting* BRIAN S. WHEELER, "DEDUCTING POST-PRODUCTION COSTS WHEN CALCULATING ROYALTY: WHAT DOES THE LEASE PROVIDE?" 8 App. J.L. 1, 8–9 (Winter 2008)) (emphasis added).

15. Tr. at 63–64.

16. Tr. at 64–65. Arkla (now known as Centerpoint Energy), sold its gathering systems to various entities. Today, many of the gathering systems in Arkansas are owned by an affiliate of CenterPoint known as Center Point Energy Field Services.

wellhead to a company such as Arkansas Oklahoma Gas Company (AOG), which owns the gathering system and then transports it through its gathering system to the end user.[17] XTO does not deduct for gathering costs in this scenario. Thus, such sales would not bring into play Plaintiffs' theories of wrongdoing. To the extent that 100% of a royalty owner's gas was sold in this manner, then that royalty owner would not be a member of either of Plaintiffs' proposed classes. XTO did not specify what percentage of its production is sold at the wellhead to AOG.

In the second scenario, XTO sells the gas it produces to its affiliate, CTES, at the wellhead. CTES then causes the gas to be taken through the gathering system, which is owned by an independent third party (or parties). CTES causes payment of the gathering charges to be made to this independent third party (or parties) for transporting the gas to the main line interconnect point where CTES sells the gas to a third party.[18]

When XTO sells the gas to CTES at the wellhead, CTES pays XTO a price "based upon the index price at a sales point on the main transmission line, less the cost to get the gas from the wellhead to the main line," this cost being the charges made by the independent gathering company (companies).[19] The royalty owner is paid based on the index price paid by CTES, less the gathering costs to get the gas to the interconnect. CTES does not add any administrative or other expenses.[20]

XTO acknowledges that in some cases the gathering contract is in XTO's name and at other times it is in CTES name, but it states that in either event, CTES is responsible for seeing to it that the gas from the wellhead gets to the interconnect on the main trans-mission line and for making sure that the gathering costs are paid.

Plaintiffs argue that XTO created its affiliate CTES to create a fictitious market at the well and to justify deducting gathering expenses from Plaintiffs' royalty payments.[21] They state that CTES has "no employees, no physical office, [and] no reason to exist." [22]

To counter this argument, XTO points out that CTES operates nationally, not just in Arkansas. Furthermore, Defendant contends that this arrangement makes sense in the particulars of the Arkansas situation. Although XTO may operate a given well it is unlikely to own 100% of it. Typically, the states establish a drilling unit such as a section of land (640 acres). And that unit may be owned by many persons. So when a well is to be drilled the interested parties enter into a joint operating agreement in which they agree to drill the well and share the expenses. Thus, very rarely would any given producer own 100% of the well. So when XTO is operating a well, it is doing it for a lot of producers with whom it has no affiliation.[23]

For example, XTO may operate a well, but own only a 20% interest in the gas sold to CTES, with five or six other entities owning the remaining 80%. So, although XTO's sale to its affiliate CTES may be characterized as "fictitious" as to XTO, as to the other owners of the well, it is a legitimate (and arguably necessary) transaction. XTO states that it could not buy other parties' gas while also doing the things CTES does. And, XTO further states that these multiple owner situations are common. It contends, "that is how the industry typically works." [24]

17. Tr. at 68.

18. Tr. at 68–69.

19. Tr. at 69. XTO states that gathering companies may bill these charges differently depending upon their contracts and how they do business. Some companies break out and separate transportation and compression costs. Some just wrap up or bundle those services into one charge. Regardless of such differences, the gathering companies are charging for the service required to transport the gas from the wellhead to the interconnect on the main line. Tr. at 70.

20. Tr. at 69–70.

21. Tr. at 18.

22. Tr. at 23.

23. Tr. at 71–73.

24. Tr. at 72.

## III. DISPUTED FACTS AND LAW

■ The Court in this Memorandum Opinion has gone to considerable lengths to set out the disputed contentions and respective arguments of the Plaintiffs and the Defendant, XTO. This recitation in no way constitutes findings of fact or conclusions of law, but rather is intended to expose the important contentions of the parties and to anticipate the factual and legal issues that might arise in the trial of the claims being asserted in this lawsuit. "Though class certification is not the time to address the merits of the parties' claims and defenses, the 'rigorous analysis' under Rule 23 must involve consideration of what the parties must prove." [25]

### A. *Unresolved Factual Issues*

Plaintiffs contend the leases are simple form leases and that they may be grouped into "proceeds" or "gross proceeds" leases based on a few words appearing in the section of the lease addressing computation of royalty payments without considering the other lease provisions. Defendant disagrees, pointing out that the leases were entered into over several decades, negotiated by different oil and gas companies, and will contain widely divergent language and other lease provisions which could bear upon the ultimate issue before the Court.

Under Plaintiffs' approach, the Court would simply assume based on the presence of a few words in the lease that the lease contains no other language that may impact the legal issues before the Court. In the Court's mind, there is a factual dispute regarding whether the leases in question are so similar that such an assumption may be made. While Plaintiff argues that the issue may be addressed by having the Court independently review any non-conforming leases, such approach would not be fair to XTO because it would in effect apply a presumption of conformity and impose upon XTO the burden of identifying non-conforming leases.

Plaintiffs contend that XTO put its varying gathering costs in a deduction described only as "transportation" on the settlement statements in order to hide the fact that it was deducting such costs. XTO, Plaintiffs argue, "knew they couldn't bill gathering expenses so they billed transportation expenses hoping nobody would find out." [26] XTO contends that its deductions for "transportation costs" were adequately and properly disclosed on the settlement statement. XTO further contends that including the "gathering costs" in the line item for "transportation costs" was appropriate and lawful. This dispute is driven to a large degree on the fact that the parties disagree on the proper definition of the term "transportation." XTO defines transportation to mean the costs to get the gas from the wellhead to the main transmission line, including any gathering costs. Plaintiffs define transportation costs to be only those costs along the transmission line, which should not include gathering expenses.[27]

This dispute bears directly upon the fraud-based theories. If the disclosure was appropriately made, then Plaintiffs' effort to portray the manner in which the gathering costs were communicated as a false representation will fail.

The named Plaintiffs signed division orders prior to XTO acquiring their leases, which XTO argues specifically authorized the deduction of the challenged gathering expenses. Thus, XTO contends that their claims are barred. During the oral argument, it was clear that Plaintiffs' counsel does not know how many other class members signed division orders or what they said. He acknowledged that he would not be surprised if "a large majority, if not all, signed something like that." [28] He speculated that the division orders signed by the Riedels and Sturgis "may have been a standard form division order." [29] While it seems highly likely that many members of the class signed division orders, it is unclear whether such

**25.** *Elizabeth M. v. Montenez,* 458 F.3d 779, 786 (8th Cir.2006).

**26.** Tr. at 17.

**27.** *Id.*

**28.** Tr. at 37.

**29.** *Id.*

division orders contain language addressing the deduction of post-production or gathering expenses and, if so, whether and how such language varied. Plaintiffs are asking the Court to simply assume that division orders signed by most, if not all, of the proposed class members have no bearing on this case. Defendants, on the other hand, contend that such division orders, based upon a correct application of Arkansas law, might be determinative, or, at least must be considered by the jury for a determination of whether such orders modified the original lease or considered as further evidence of the parties' understanding of the original lease.

## B. *Unresolved Issues of Arkansas Law*

Both sides in this Rule 23 certification proceeding rely heavily on the Arkansas Supreme Court case of *Hanna Oil and Gas Co. v. Taylor*.[30] Both state that Arkansas law is clear, yet each takes an entirely different view as to the proper interpretation of this seminal case. Both can not be correct. To resolve the matter the Court would have to make a partial ruling on the merits, which both parties concede is not permitted at this point.[31] The Court finds that the Arkansas law is not sufficiently resolved such that the Court can conclude, as Plaintiffs' argue, that any lease with the words "proceeds" or "gross proceeds" simply will not permit deduction of post-production gathering expenses. Accordingly, the case is not, as Plaintiffs' counsel states, a "[s]traight arrow, simple case."[32]

Plaintiffs rely on *Hanna* for the proposition that "under Arkansas law, oil and gas leases that require a lessee to pay royalties based on 'proceeds' or 'gross proceeds' do not allow the deduction of expenses from royalty payments."[33] XTO counters that Plaintiffs' reliance on *Hanna* is misplaced and that the decision actually supports its position. The Court agrees with XTO that the ruling in

*Hanna* does not, as Plaintiffs suggest, resolve the issue in this case as a matter of law such that the Court can simply declare that XTO violated Arkansas law when it deducted any costs from royalty payments on those leases which required payments based on "proceeds" and/or "gross proceeds."

As an alternative to *Hanna*, Plaintiffs assert that "Arkansas recognizes an implied covenant to market, which requires XTO to bear the costs of putting the gas in a physical condition acceptable to be sold in a commercial market and also to deliver the gas to a commercially sellable location."[34] However, in the one Arkansas case relied upon by Plaintiffs, *Amoco Production Co. v. Ware*,[35] the Arkansas Supreme Court specifically rejected the contention that the alleged implied covenant existed. The *Amoco Production* court described the general state of the law as to implied covenants in oil and gas leases:

The parties had a comprehensive oil and gas lease with the usual provisions and expressed covenants. An implied covenant is one that may be reasonably inferred from the whole agreement and the circumstances attending its execution. They are not favored by the law and can be justified only upon the ground of legal necessity arising from the terms of the contract and the circumstances attending its execution. 20 Am.Jur.2d, Covenants, § 12.

According to a leading authority in the field of oil and gas law, there are essentially five types of implied covenants in oil and gas leases: A covenant to drill wells within a reasonable time, testing the land for oil and gas; a covenant to drill test wells within a reasonable time after notice; a covenant, if oil or gas be found in paying quantities, to proceed with reasonable diligence in drilling sufficient number of wells to reasonably develop the premises; a covenant to protect the land from drainage through wells on adjoining lands, by drill-

---

30. 297 Ark. 80, 759 S.W.2d 563 (Ark.1988).

31. *See Eisen v. Carlisle & Jacquelin,* 417 U.S. 156, 177, 94 S.Ct. 2140, 2152, 40 L.Ed.2d 732 (1974) (federal courts may not "conduct a preliminary inquiry into the merits of a suit in order to determine whether it may be maintained as a class action").

32. Tr. at 45.

33. Reply at 2.

34. *Id.*

35. 269 Ark. 313, 602 S.W.2d 620 (Ark.1980).

ing offset wells; and, a covenant to market the produce of producing wells. Summers, The Law of Oil and Gas, Chpt. 13, § 395 (Vol.2, 1959).[36]

XTO agrees that *Hanna* provides a "road map" for the analysis the Arkansas Supreme Court would undertake to determine whether the challenged deductions were lawful, but points out that the starting point for the analysis is to "first examine the language of the oil and gas lease."[37] The Court must also consider "the construction the parties themselves placed on their agreement" because the "construction placed upon an agreement by the parties is an important, and often decisive factor in construing an instrument."[38]

Thus, XTO insists that under *Hanna* the Court is required to look not only at the four corners of the various leases but also at any other agreements, communications, or, indeed, anything which would allow one to determine what the parties' intent or understanding was, if any, with respect to the challenged post-production deductions. Among the most significant related agreements, XTO argues, are the division orders, which were usually signed by the royalty owners early on in the relationship. Both the Riedels and Sturgis signed division orders containing language that XTO contends specifically acknowledged the propriety of the deduction of the post-production expenses. Plaintiffs argue that division orders are completely irrelevant, and, indeed, inadmissable as evidence because as a matter of law a division order may not change the terms of a lease. Assuming that is so, the Court can not at this juncture hold as a matter of law that such division orders are completely irrelevant and inadmissible. This issue is discussed in greater detail in connection with that portion of the Opinion addressing typicality and adequacy.[39]

XTO argues that Plaintiffs are pressing the Court to make merits decisions in their favor and to use such favorable decisions "as a jumping off point to certify the class."[40] The Court agrees. If Arkansas law were clear on the requirement that the challenged post-production expenses could not be deducted in the absence of contractual language specifically permitting the deduction of such expenses, then it would be more likely that this case would be suitable for certification as a class action. However, Arkansas law is unclear. It appears, based on the evidence that will have to be considered to resolve the legal issues, that a generalized method of proof based simply on the two terms "proceeds" and "gross proceeds" may be inappropriate in this case. To permit such a generalized method of proof under these circumstances would, in effect, deprive XTO of the opportunity to defend against the individual claims of the purported class members. This issue is discussed further in connection with the Court's Rule 23(b)(3) analysis.[41]

Plaintiffs' counsel argues that this case presents "the exact same issue" that arose in two other class actions which XTO previously settled in Oklahoma and Colorado. The Oklahoma case is *Booth v. XTO,* Dist. Court for Deway County, Oklahoma, Case No. CJ–98–16 ("the *Booth* case")[42] The Colorado case is *Burkett v. J.M. Huber Corp. et al.,* District Court of LaPlata County, Colorado, Case Number 04 CV 255 ("the *Burkett* case"). Defendants disagree. Defendants argue that the situation here is different for many different reasons including, most importantly, the striking difference between Oklahoma and Colorado law on the one hand, which has adopted the minority view of this issue, and Arkansas law, which Defendant contends follows the majority view, and therefore, supports its position in this case.[43]

---

**36.** *Id.,* at 313, 320–21, 602 S.W.2d at 623–24.

**37.** *Hanna Oil,* 297 Ark. at 81, 759 S.W.2d at 564.

**38.** *Id.,* 297 Ark. at 82, 759 S.W.2d at 565.

**39.** *See* infra Section IV, B, 3.

**40.** Tr. at 119.

**41.** *See infra* Section IV, C.

**42.** Plaintiff presented a copy of the settlement agreement during the hearing. See Pl.'s Exhibit 31.

**43.** XTO's counsel also pointed out that the *Burkett case* involved "a minimal number of wells" all of which were located in one county. Further, it

The Court in its March 19th Letter Order[44] referenced that fact that it appeared that at least one commentator had grouped Arkansas, Colorado, Kansas, and Oklahoma as states which handle such issues similarly.[45] During the hearing, XTO's counsel asserted that the commentator in question had misconstrued the statement of another commentator, Mr. Poitevent, in a previously published law review article appearing in the South Texas Law Review.[46] Mr. Poitevent concluded:

Arguably, none of the courts in Arkansas decisively reject the "at the well" theory of deductibility; rather, Arkansas is now a "quasi-marketable product" state. Arkansas courts have reached holdings consistent with the marketable product rule, even as they have failed to enunciate its rationale. *Hanna Oil & Gas Co. v. Taylor*, in particular, may be distinguished from marketable product decisions because it cites the parties' course of dealing as a compelling argument. As a result, the Arkansas courts appear reluctant to choose sides in the developing schism. Oklahoma is doing its best to pull Arkansas onto the marketable product side by citing its decisions. However, it appears that Arkansas is still reluctant to commit.[47]

The Court agrees that Arkansas law is, in fact, unclear, and that, at this point, it can not be said that Arkansas has joined the states of Colorado and Oklahoma in adopting what is a minority position with respect to the deduction of post-production costs.[48] The majority of states do not require a lessee to bear the costs of marketing production alone.[49]

The uncertainty of Arkansas law combined with the factors the Arkansas Supreme Court requires to be examined in order to construe an oil and gas lease, including the lease itself and the parties' course of dealing, make this a case which is very different from the Oklahoma and Colorado cases relied upon by Plaintiffs.

## IV. RULE 23 ANALYSIS

To prevail on their motion, Plaintiffs must first demonstrate that the proposed class certification satisfies the four prerequisites of Fed.R.Civ.P. 23(a),[50] commonly referred to as: (1) numerosity; (2) commonality; (3) typicality; and (4) adequacy. In addition, Plaintiffs must prove that this class action fits into one of the three types of class actions described in Rule 23(b), in this case either Rule 23(b)(2)[51] or Rule 23(b)(3).[52]

---

appears that XTO, more or less, "bought into" the Colorado situation by acquiring leases that were already the subject of controversy. Tr. at 103.

**44.** Docket No. 55.

**45.** *See* Brian S. Wheeler, "Deducting Post-Production Costs When Calculating Royalty· What Does the Lease Provide?" 8 App. J.L. 1, 8–9 (Winter 2008) (identifying such states as recognizing some version of an implied covenant to market production rule).

**46.** Tr. at 93. *See* Edward B. Poitevent, Post-Production Deductions from Royalty, 44 S. Tx. L.R. 709, 743–44 (Summer 2003).

**47.** *Poitevent*, 44 S. Tx. L.R. at 747.

**48.** Should it continue to appear that this issue of law may be determinative of the case and that there is no controlling precedent in the Supreme Court of Arkansas, it may be appropriate to certify this question of law so that it may be resolved by Arkansas' highest state court. *See* Rule 6–8 of the Rules of the Supreme Court of the State of Arkansas. During the hearing, counsel for both

parties took the position that certification is not necessary.

**49.** *Id.* at 716 (describing the majority rule as the "at the well" rule).

**50.** Fed.R.Civ.P. 23(a) states:
(a) Prerequisites.
One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4) the representative parties will fairly and adequately protect the interests of the class.

**51.** Fed.R.Civ.P. 23(b)(2) allows a class action to be maintained if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole."

The burden is on Plaintiffs to demonstrate that all of the requirements for class certification have been satisfied. *Coleman v. Watt,* 40 F.3d 255, 258–59 (8th Cir.1994). Plaintiffs have proposed two classes. They must demonstrate that the class certification requirements are met as to each class.

Defendant, in its surreply brief, identifies three areas where Plaintiffs have failed in their class certification effort. Defendants argue: (1) that the allegations of numerosity are based on mere speculation; (2) that their claims under Arkansas law will require individualized inquiries into contracts and evidence; and (3) that Plaintiffs' claims may not be typical and they may not be suitable class representatives because their claims are subject to unique defenses.

The Court will discuss each of these Rule 23 requirements separately.

### A. *Ascertainability*

 Rule 23 requires that any order certifying the class "must define the class." [53] "Although the identity of individual class members need not be ascertained before class certification, the membership of the class must be ascertainable." [54]

Plaintiffs recognize that the class must be defined such that class members can be identified using objective data. On this record, it appears that the information maintained by XTO on the wells it operates and the royalty owners it pays, combined with the public records identifying any missing oil and gas leases, will permit class members to be identified if class certification is permitted.

### B. *Prerequisites to Class Certification*

#### 1. Numerosity

 Rule 23(a)(1) allows class certification only if "the class is so numerous that joinder of all members is impracticable." "Impracticability is a subjective determination based on number, expediency and inconvenience of trying individual suits." [55]

 Defendant complains that Plaintiffs are merely "guessing how many of the [Arkansas] 18,000 royalty owners listed in a spreadsheet produced by XTO fall into Plaintiffs' proposed class definitions." [56] The law does not require evidence of exact class size. As stated by a leading treatise on the subject:

> Though some courts have said that a class action determination may not be based on mere speculation, the prevailing view is that the plaintiff need not allege the exact number or identity of class members. A contrary rule would foreclose most class litigation because of the impossibility of identifying all class members at the outset and would make large class suits unduly burdensome because of the great expense involved in identifying members. While the plaintiff has the burden of showing that joinder is impracticable, a good-faith estimate should be sufficient when the number of class members is not readily ascertainable. Courts have denied class motions for lack of numerosity when the plaintiff has failed to provide facts or demonstrate circumstances that would provide support for a reasonable estimate of class

---

**52.** Fed.R.Civ.P. 23(b)(3) allows a class action to be maintained if "the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy." The Rule then specifies the following four issues to be considered in making this determination:

 (A) the class members' interests in individually controlling the prosecution or defense of separate actions;
 (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

 (C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
 (D) the likely difficulties in managing a class action.
Fed.R.Civ.P. 23(b)(3).

**53.** Fed.R.Civ.P. 23(c).

**54.** Manual for Complex Litigation, § 21.222 (4th ed.2004).

**55.** *Pabon v. McIntosh,* 546 F.Supp. 1328 (D.C.Pa. 1982) (omitting citations).

**56.** Surreply, Docket No. 47 at 3.

size.[57]

To provide the requisite reasonable estimate, Plaintiffs had Louis J. Buffington[58] copy 600 oil and gas leases from the public records of Pope, Franklin, and Johnson Counties in Arkansas. These 600 leases are presumably a subset of the 18,567 royalty owners found on the Arkansas Current Royalty Owner List previously provided by XTO.[59] Mr. Buffington examined these 600 leases and declared them to be "standard form leases" capable of being divided into five different types of leases depending on royalty clauses. XTO was either required to pay the Lessor royalty owner a percentage of either the "proceeds," "gross proceeds," "net proceeds," "market value," or a "fixed price."

Mr. Buffington states that of the approximately 600 leases he copied and examined, 438 were "proceeds" leases with royalty clauses identical to the language of the lease covering the lands of named Plaintiffs Calvin and Linda Riedel.[60] These "proceeds" leases purportedly state that Lessee will pay the Lessor royalty owner based on a percentage "of the proceeds received by lessee at the well."[61] Copies of the 438 "proceeds" leases are attached as Exhibit A, Volumes 1 and 2, to Mr. Buffington's supplemental affidavit.

Mr. Buffington found 43 of the 600 leases he examined to be "gross proceeds" leases with royalty clauses identical to the language of the lease covering the lands of named Plaintiff Peggy Sturgis.[62] These "gross proceeds" leases purportedly state that Lessee will pay the Lessor royalty owner based on a percentage " 'of the gross proceeds . . . from the sale of gas from each well . . . ' "[63] Copies of the 43 "gross proceeds" leases are attached as Exhibit B to Mr. Buffington's supplemental affidavit.

Based on Mr. Buffington's findings, Plaintiffs argue:

There are at least 438–543 Class 1 Members who have "proceeds" leases with identical language as the Riedel lease and possibly as many as 13,000 Class 1 Members (73% of 18,000). There are at lease 43–49 Class 2 Members who have "gross proceeds" leases with identical language to the Sturgis lease and possibly as many as 1,200 Class 2 Members (7% of 18,000). See, Buffington Supplemental Affidavit, Ex. "27" and Ballentine Affidavit, Ex. "7."[64]

Defendant argues in its surreply brief that not all of the potential class members identified are proper members of the class because they may not have received payment from XTO "from which charges described as transportation were deducted" which is a requirement for inclusion in the class. Thus, Defendant argues, "Plaintiffs have merely identified some leases that may relate to potential class members."[65] Defendant points to the deposition testimony of Terry L. Schultz, XTO's Senior Vice–President of Marketing, in which he stated that some gas is sold at the well, and therefore, there will be no transportation charges reflected on their settlement statements. While Mr. Schultz does make this general statement (at page 18 of his deposition), he then testifies, on page 23 of this deposition that the market has evolved such that "[p]urchasers do not today buy at the wellhead."

The Court recognizes that Plaintiffs' estimate likely is high since they did not consider whether the identified potential class

---

**57.** 1 Newberg on Class Actions, § 3:5 (4th ed.) (omitting footnotes) (hereinafter referenced as "Newberg").

**58.** A copy of Mr. Buffington's C.V. is attached to his first Affidavit. *See* Exhibit 6 to Plaintiffs' motion. It indicates that Mr. Buffington has over thirty years of experience in the oil and gas industry and that he has worked for the past 8 or 9 years as a landman in Boerne, Texas.

**59.** This list was attached as Exhibit 10 to Plaintiffs' motion and filed under seal.

**60.** Supplemental Affidavit of Louis J. Buffington, Exhibit 27 at ¶ 3. Plaintiffs' Exhibit 27 is attached to Plaintiffs' reply brief.

**61.** *Id.*

**62.** *Id.* at ¶ 5.

**63.** *Id.*

**64.** Plaintiffs' Reply at 7.

**65.** Surreply, Doc. No. 47 at 4.

members had actually received a settlement statement showing a deduction for transportation charges. However, there is no bright line rule for determining that the requirement of numerosity is satisfied, and it has been stated that "class numbers in the 40–or–more range should have a reasonable chance of success on the basis of number alone." [66] The Court rejects Defendant's assertion that Plaintiffs' presentation on numerosity is "mere guesswork." The Court finds that Plaintiffs, based on their view of the facts and the law, have provided a reasonable estimate to support the conclusion that joinder is impracticable. The Court concludes that Plaintiffs have, according to their view of the case, met the numerosity requirement.

## 2. Commonality

■ The requirement of commonality is described as follows in Newberg on Class Actions:

> Rule 23(a)(2) does not require that all questions of law or fact raised in the litigation be common. The test or standard for meeting the Rule 23(a)(2) prerequisite is qualitative rather than quantitative; that is, there need only be a single issue common to all members of the class. Therefore, this requirement is easily met in most cases. When the party opposing the class has engaged in some course of conduct that affects a group of persons and gives rise to a cause of action, one or more of the elements of that cause of action will be common to all of the persons affected.[67]

66. Newberg at § 3:5.

67. Newberg, at § 3.10. *See also DeBoer v. Mellon Mortgage Co.*, 64 F.3d 1171, 1174 (8th Cir.1995) (commonality requirement is satisfied "when the legal question 'linking the class members is substantially related to the resolution of the litigation.' "); *Like v. Carter*, 448 F.2d 798, 802 (8th Cir.1971) (reversing district court's denial of class certification based on factual variations between each class member when common questions of law were present).

68. Reply at 14.

69. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 2249–50, 138 L.Ed.2d 689 (1997).

Plaintiff states that the common issue to be decided on a class-wide basis is "whether XTO can deduct from Class Members royalty payments, the gathering expenses which are necessary to put the Class Members' gas in a marketable condition and necessary to deliver the gas to the transmission pipeline where the gas can be sold to a bona fide third party purchaser." [68] Plaintiff argues that the variations in "proceeds" or "gross proceeds" leases do not alter XTO's fundamental obligation not to deduct gathering expenses from the royalties paid to classmembers.

■ XTO argues that Rule 23(a)'s commonality requirement is not satisfied. It contends that a lease by lease analysis will have to take place and that such an effort will destroy commonality. It also argues that the predominance of common issues requirement of Rule 23(b)(3) is not satisfied. Of course, Rule 23(b)(3)'s predominance requirement is "far more demanding" than Rule 23(a)'s predominance requirement and "tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation." [69]

■ The commonality test is met where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members.[70] Moreover, "[t]he existence of shared legal issues with divergent factual predicates is sufficient, as is a common core of salient facts coupled with disparate legal remedies within the class." [71] "Individualized issues may coexist with common issues and do not prevent the action from meeting the Rule 23(a)(2) requirement." [72]

70. *Hickey v. City of Seattle*, 236 F.R.D. 659 (W.D.Wash.2006).

71. *Bafus v. Aspen Realty, Inc.*, 236 F.R.D. 652, 656 (D.Idaho 2006)(omitting citation).

72. Newberg, § 21:3; *See also Paxton v. Union National Bank*, 688 F.2d 552, 561 (8th Cir.1982) (holding, in employment discrimination case, that factual variations in the way an employer's discriminatory conduct affected individual employees did not defeat Rule 23(a)(2) commonality).

If, as Plaintiffs contend, XTO violated Arkansas law by deducting from the class members' royalty payments post-production expenses which should not have been deducted in the absence of contractual language specifically permitting such deductions, then the resolution of that common issue will affect all or a significant number of the putative class members. The Court concludes that Rule's 23(a)'s commonality requirement is satisfied and that XTO's objections are better addressed when determining whether the common issues predominate such that certification under Rule 23(b)(3) is appropriate. That issue is discussed below in Section IV, C.

### 3. Typicality and Adequacy of Representation

■ While the first two Rule 23 prerequisites, numerosity and commonality, require an examination of the proposed class, the latter two, typicality and adequate representation require an examination of the class representatives.[73] "The typicality prerequisite assures that the class representative shares the issues common to other class members." [74] Generally, a claim asserted by a class representative is deemed typical "if it arises from the same event, practice, or course of conduct giving rise to the claims of other class members and is based on the same legal theory." [75] The adequacy of representation requirement focuses on whether: "(1) the class representatives have common interests with the members of the class, and (2) whether the class representatives will vigorously prosecute the interests of the class through qualified counsel." [76]

■ The analysis is sometimes combined, particularly where a class representatives' claims are significantly different from the proposed class members' claims.[77] The Court combines the analysis here because XTO argues that both requirements are unsatisfied based on the same contention.

XTO argues that typicality and adequacy are destroyed here because the claims of the class representatives are subject to unique defenses. For cause, XTO points to the division orders signed by Plaintiffs.

In 1986, prior to the acquisition of the lease by XTO, the Reidels signed a division order containing the following provision:

6. You are authorized to deduct from the proceeds of production sold or accounted for hereunder any costs necessary to render such production merchantable and/or any reasonable charges or allowances for extraction of liquid hydrocarbons or otherwise processing such production (including but not limited to compressing, dehydrating and other treatment costs and charges); as well as costs of marketing and handling the same (including but not limited to truck, barge, tank car or pipeline transportation charges and other costs of collecting and transporting the production from the property to the receiving station, point of connection, with the career or other marketing or delivery point).

In 1985, Plaintiff Peggy Sturgis signed a Division Order reading in part:

In making the settlements for the interest of the undersigned in the proceeds from the sale of gas, you are authorized to use the market value at the wells for the gas sold or used off the property or the net proceeds received by you at the wells when the gas is sold at the wells. You are authorized to make a fair and reasonable charge for compressing, and making merchantable the undersigned's share in the gas sold off the property, said charges to be shown as a proper deduction from the gross amount to determine the market value at the wells currently payable as royalty.

XTO contends that the division orders signed by the Riedels and Sturgis completely bar their claims. Because they explicitly authorized or directed XTO to make the challenged deductions, XTO contends, they are

---

73. Newberg, at § 3:13.

74. *Id.*

75. Newberg, at § 3:16.

76. *Paxton*, 688 F.2d at 562.

77. *In re GenesisIntermedia, Inc. Sec. Litig.*, 232 F.R.D. 321, 330 (D.Minn.2005).

asserting a position in this case directly contrary to the division orders they signed. Thus, XTO argues that the division orders destroy typicality and adequacy of representation.[78]

Plaintiffs, on the other hand, argue that the division orders may not change the terms of the oil and gas lease, that any language included in the division order that contradicts the lease must be considered null and void, and that such orders are adhesion documents which they (and other class members who signed division orders) had to sign in order to get their check.[79] The sole purpose of the division orders, argue Plaintiffs, is to confirm the royalty owners name, address, and percentage ownership. Plaintiffs point to similar cases which have been certified and point out that those class members also had signed division orders, but that it did not defeat class certification. Plaintiffs go so far as to state that the division orders are "totally irrelevant" and inadmissible at trial.[80]

Defendant XTO argues that "[s]o long as there is a division order in place, the rule in the industry is that it modifies the lease terms." [81] This statement is not without legal support. As stated in Corpus Juris Secundum:

Although a division order does not supplant the lease, it is binding between the parties for the time and to the extent that it has been or is being acted on and made the basis of settlements and payments, and constitutes a revocable authorization to pay, binding upon the royalty owners until revoked. A division order constitutes an agreement by the signatories to receive only that portion of the proceeds listed in the order, and may alter the lease provisions concerning distribution. A royalty owner who executes a division order is bound by its provisions, which may abrogate or alter rights under the lease.[82]

The law on the impact of the division orders is not entirely clear. The issue need not (and arguably must not) be resolved now. This much is clear. The impact of the division orders signed by the class representatives must be considered. Contrary to Plaintiffs' assertion, the Court may not at this point simply dismiss the division orders by labeling them irrelevant and holding that they must even be excluded from consideration at trial. The Court must therefore consider whether the division orders affect typicality or adequacy.

As the Court has already observed, the contracts at issue likely will not address the issue of post-production expenses. Thus, this is likely not a situation where XTO will be attempting to rely on a division order to contradict or change the terms of a prior agreement. Rather, it appears far more likely that the division orders of the representative Plaintiffs will in fact have to be considered for what they have to say about issues such as Plaintiffs' understanding of the contract, their knowledge about how they were being paid, and their reliance on the settlement statements.

Other district courts in the Eighth Circuit have held that "where the representative parties are subject to unique defenses, their claim is not typical of the class." [83] It is enough that an arguably unique defense is present, whether or not such defense is ultimately successful.[84]

It appears that not all of the proposed class members signed division orders. And, for those who did, it is unclear whether such division orders will include language similar to that included in the division orders signed by the named Plaintiffs.

This issue also bears on the Plaintiffs' adequacy as class representatives. Where the

---

78. Tr. at 88.

79. Tr. at 38–40.

80. Tr. 38–39.

81. Tr. at 87–88.

82. C.J.S. Mines § 294 Division or transfer orders (2009).

83. *In re GenesisIntermedia, Inc. Securities Litig.*, 232 F.R.D. 321, 329 (D.Minn.2005) (quoting *Irvin E. Schermer Trust by Kline v. Sun Equities Corp.*, 116 F.R.D. 332, 336–37 (D.Minn.1987)).

84. *Id.*

"representative parties have interests or claims that are significantly different than those of the majority of the class members, then neither typicality nor adequacy is present."[85] XTO's theory is that the named Plaintiffs, faced with the necessity of defending against the effect of the division orders, will create a conflict between their interests and those of the class members who will not be subject to such defenses.

It is, of course, Plaintiffs' burden at this point to prove that all the Rule 23 requirements have been satisfied. Plaintiffs have attempted to satisfy their burden by simply arguing that the division orders are irrelevant and inadmissible at trial. Because the Court can not make such a finding, the Court concludes that Plaintiffs have failed to carry their burden as to typicality and adequacy of representation.

## C. *Class Certification for Damages— Rule 23(b)(3)*

Plaintiffs claim the proposed classes satisfy the requirements of Rule 23(b)(3). One of the requirements of the rule is that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members."[86] The requirement " 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.' "[87]

The principal issue in this case is whether the natural gas contracts of the class members prohibited XTO from deducting post-production expenses from their royalty payments. To answer whether common issues predominate, it is appropriate to conduct "a limited preliminary inquiry" "to determine whether, given the factual setting of the case, if the plaintiff's general allegations

are true, common evidence could suffice to make out a prima facie case."[88]

Plaintiffs deny that individual issues predominate. They contend that varying language in the form leases will not alter the issue of whether class members are entitled to receive "proceeds" or "gross proceeds" from the sale of their gas, without deduction of gathering expenses. Most of the leases, Plaintiffs argue, were standard form leases. Mr. Buffington states that there are approximately five (5) types of royalty clauses in standard form oil and gas leases, requiring lessees to pay the lessor royalty owner a percentage of either the "proceeds," "gross proceeds," "net proceeds," "market value," or a "fixed price."[89] Plaintiffs offer the deposition testimony of Paula Foley, Manager of Lease Administration for XTO. Ms. Foley testified that XTO does not capture or include in its electronic data any information to identify its leases as "proceeds," "gross proceeds," "net proceeds," or "market value" leases.[90]

Further, Plaintiffs contend that XTO engaged in a course of conduct by which it completely ignored the language of the class members' leases in calculating their royalties. XTO allegedly employed a uniform scheme to deduct post-production expenses "notwithstanding the absence of any language in the royalty provision permitting XTO to deduct these expenses from royalties paid to members of the proposed class."[91] Plaintiffs argue that it is unnecessary to make individualized inquiry into the parties' intent or to examine the leases individually in every case. Should the Defendant raise an individual issue as to a lease of a particular class member, Plaintiffs propose that such leases simply be deleted from the class or reviewed by the Court to determine whether other con-

---

85. *Id.* at 330.

86. Fed.R.Civ.P. 23(b)(3).

87. *Blades v. Monsanto Co.*, 400 F.3d 562, 566–67 (8th Cir.2005) (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997)).

88. *Id.* at 566.

89. Suppl. Affidavit, Exh. 27.

90. Foley Depo., Exh. 21 at p. 77.

91. Affidavit of W.R. Harper, Jr., Exh. 5 to Plaintiffs' motion. Mr. Harper is a consultant who has worked in the oil and gas industry for over 34 years. The Court accepts for purposes of this motion that Mr. Harper is qualified to render expert testimony, but it disregards that portion of his affidavit which suggests a legal conclusion that he is not qualified to make.

tractual language alters XTO's obligation to pay royalties based solely on "proceeds" or "gross proceeds."

XTO strongly disagrees with Plaintiffs' approach. XTO submits that the "incredible multitude" of different lease forms used by different companies and different "landsmen" during the 1950s, 1960s, 1970s, and 1980s, all containing different terms and conditions and subject to a variety of division orders, will require separate trials in order to determine the parties' intent with regard to the handling of post-production costs. XTO further contends that the Court may not simply interpret the leases as a matter of law based solely on the presence of language in the royalty clause requiring that payment for gas be made based on a percentage of either "the proceeds" or "the gross proceeds." There may be other language in the royalty clause or elsewhere in the lease which impacts the contract interpretation. Thus, XTO argues, each lease will need to be independently reviewed and construed.

As an example, XTO points to a sample lease provided by Plaintiffs dated May 10, 1979 from James McGuire, which contains the following royalty clause:

> 2nd. To pay lessor for gas of whatsoever nature or kind (with all of its constituents) produced and sold or used off the leased premises, or used in the manufacture of products therefrom, one-eighth (1/8) *of the gross proceeds received for the gas sold,* used off the premises, or in the manufacture of products therefrom, *but in no event more than one-eighth (1/8) of the actual amount received by the lessee* ... (emphasis added).[92]

Although the lease contains the qualifying language and Mr. McGuire would therefore be included in the class, the Court would be required to interpret the additional, qualifying language and to apply it to Mr. McGuire's situation.

The record evidence leads the Court to conclude that it may not simply presume, based solely on the fact that the contracts share a few words in common, that all class members entered into standardized form contracts which prohibited the deduction of post-production expenses. XTO has provided one example of additional language which, arguably, changes the meaning of the contract and proper payment under the royalty clause. The leases in question were entered into over numerous years and negotiated by numerous different parties. Further, many, if not most, of the leases were entered into when currently understood post-production expenses did not exist. Thus, the contracts are unlikely to address the issue specifically. At this point it appears likely, based on Arkansas law, that the Court will be required to examine anything that bears upon the intent of the parties or their course of dealing to properly interpret the contract

The Court is unable to find in this case that the *same evidence* will suffice for each class member to make a prima facie showing as to any of Plaintiff's proposed claims. Rather, it appears clear at this point that individual issues will predominate. Again, the industry's evolution lends credence to Defendant's argument that the lease language of the contracts at issue in this case are likely to vary widely and may not simply be considered "form leases" or interpreted based solely on one or two words ("proceeds" or "gross proceeds"), as Plaintiffs argue. On this record, the Court is unwilling to simply accept that no other language in the various contracts is likely to have relevance to the threshold question of whether the challenged deductions were permissible under Arkansas law. Nor is the Court willing to certify a class, the effect of which will be to apply a presumption that there is no other language in the numerous class members' contracts that bears upon the legal issues before the Court. As the Court has already discussed, there is also the issue of the different division orders, which most of the class members purportedly signed. There is no evidence in the record of how similar or dissimilar such division orders may be. And, to repeat, it may be necessary to consider such division orders and their legal effect under Arkansas law.

For all of these reasons, the Court concludes that Plaintiffs have failed to demon-

---

**92.** Def.'s response brief, at 14 (referencing one of Plaintiffs' exhibits).

strate that common issues predominate over individualized questions or that a class action is the superior method of adjudicating the present controversy. This case is not appropriate for certification under Rule 23(b).

### D. *Classification for Injunctive Relief Rule 23(b)(2)*

██ While Plaintiffs acknowledge that this is primarily an action for money damages to be qualified for class action treatment under Rule 23(b)(3), they also seek class certification under Rule 23(b)(2) for corresponding declaratory or injunctive relief. Rule 23(b)(2) allows class actions to be maintained when all the prerequisites of Rule 23(a) have been met and "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Fed. Rule Civ. P. 23(b)(2).

Plaintiffs' acknowledge that class certification under Rule 23(b)(2) is requested in the alternative.[93] Plaintiffs further acknowledge that for certification under Rule 23(b)(2), such actions "may not predominantly seek money damages."[94]

██ Certification "under Rule 23(b)(2) is precluded where monetary relief is sought, unless such monetary relief is incidental to the requested injunctive or declaratory relief."[95] "When substantial damages have been sought, the most appropriate approach is that of Rule 23(b)(3) because it allows notice and an opportunity to opt out."[96] The primary thrust of Plaintiffs' case is to recover unlawfully deducted expenses. The request for monetary relief is clearly primary, and not incidental. Accordingly, this case is not suitable for certification as a Rule 23(b)(2) class action.

93. Reply at 29.

94. Pls.' memo. at 53.

95. *Glenn v. Daddy Rocks, Inc.,* 203 F.R.D. 425, 430 (D.Minn.2001) (citations omitted).

### CONCLUSION

After careful consideration of the record in this case and applicable law, the Court concludes that Plaintiffs have failed to demonstrate the Rule 23(a) prerequisites of typicality and adequacy of representation. This conclusion is dispositive of their certification request. Additionally, and alternatively, the Court concludes that Plaintiffs have also failed to carry their burden to show that this case is appropriate to proceed either as a class action under Rule 23(b)(2) or 23(b)(3). Accordingly,

IT IS THEREFORE ORDERED THAT Plaintiffs' Motion for Class Certification (Docket No. 28) be, and it is hereby, DENIED.

IT IS SO ORDERED.

96. *Jefferson v. Ingersoll Intern. Inc.,* 195 F.3d 894, 898 (7th Cir.1999).